THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ANDREW WILSON, Defendant-Appellant.
First District (6th Division) No. 1—88—2578

Opinion filed September 30, 1993.

Rita A. Fry, Public Defender, of Chicago (Alison Edwards, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Kevin Sweeney, Assistant State's Attorneys, of counsel), for the People.

JUSTICE EGAN delivered the opinion of the court:

On February 4, 1983, the defendant, Andrew Wilson, and his brother, Jackie Wilson, were found guilty by a jury of the murder of two Chicago police officers, William Fahey and Richard O'Brien, and two counts of armed robbery. The defendant was sentenced to death, but the jury was unable to agree to impose the death penalty on Jackie Wilson, who was sentenced to a term of natural life imprisonment. The Illinois Supreme Court reversed the conviction of Andrew Wilson on the ground that his confession had been coerced. (*People v. Wilson* (1987), 116 Ill. 2d 29, 506 N.E.2d 571.) The defendant was again convicted of both murders and armed robberies by a jury on June 20, 1988. After six days' deliberation, the jury was unable to agree that the defendant was eligible for the death penalty. He was sentenced to a term of natural life imprisonment. He does not contest the sufficiency of the evidence to support the murder convictions; but he does seek a reversal of his armed robbery convictions on the ground that the evidence was insufficient. He seeks a new trial on the murder charges on several grounds.

On February 9, 1982, Chicago police officers William Fahey and Richard O'Brien were on duty in a squad car. They had stopped a Chevrolet with a damaged front grille at the 8100 block of South Morgan Avenue in Chicago. The driver of the car was later identified as Jackie Wilson, and the passenger was identified as Andrew Wilson. The passenger shot and killed both officers. Tyrone Sims saw the entire incident from his front window at his home located at 8108 South Morgan. Dewayne Hardin, a passenger in a car travelling northbound near 82nd and Morgan, saw the two men enter their car and drive away after the shooting.

Several police officers arrived at the scene. Fahey was dead; O'Brien was still alive but died later. The service revolvers of both officers were missing. A case containing eyeglasses, which were later traced to the defendant, was found lying near Fahey. The police also recovered a bullet which fell from O'Brien's jacket.

Tyrone Sims testified he saw a police car turn on its flasher and pull over a burnt orange or rust-colored Chevrolet with a damaged

front grille in front of his house. The drivers of both cars got out, met "half-way" and walked back to the Chevrolet. He identified the driver of the Chevrolet as Jackie Wilson. (The driver of the police car was later identified as Officer Richard O'Brien.) O'Brien asked the driver for his license, which the driver surrendered. As O'Brien leaned into the Chevrolet, the passengers of both the Chevrolet and the police car got out. The passenger of the Chevrolet, identified by Sims as Andrew Wilson, threw a jacket back into the car and the police passenger, later identified as William Fahey, told the passenger to give him the jacket. Fahey went through the jacket, found something and took out his handcuffs. As Fahey was trying to handcuff the passenger, both men fell. The passenger then came up with a "shiny pistol," put it to the back of Fahey's head and fired. As O'Brien came around the trunk of the car, the passenger fired two shots. When O'Brien fell, the passenger got up on the trunk and fired two more shots toward O'Brien. He then got off the trunk, picked up his belongings and shouted, "Let's get out of here" to the other man. At that point, Sims left to call the police.

About 10 hours later, Sims met with a police sketch artist to prepare a drawing of the man who fired the shots. Sims and the artist prepared a drawing of the shooter, and Sims also gave a detailed verbal description of the shooter which was then written at the bottom of the sketch. The sketch and part of the description were circulated in a police bulletin.

The next day Sims was hypnotized by Dr. Bennett Braun in an effort to recall the license number of the Chevrolet. Before the hypnosis, Sims had given a detailed statement of the incident to the police.

The following day, February 11, Sims viewed a lineup but was unable to make an identification. On February 12, Sims picked out the photographs of two men. He told the police that those two men "looked something like the people that was out there that day of the incident." The two men, whose pictures he had tentatively picked out, were Donald (Kojac) White and Dwight Anthony.

On February 13, Sims viewed a lineup which included White and Anthony. He did not recognize them as the two men involved in the shooting. The following day, Sims viewed another lineup and identified Andrew Wilson as the shooter and Jackie Wilson as the driver.

Dewayne Hardin was a passenger in the front seat of a car going northbound near the corner of 82nd and Morgan. The driver of the car was Andre Coulter. Hardin testified that he saw one man, who was smiling, get into the driver's side of a brown Chevrolet with damage to the front grille. As the brown Chevrolet drove past Hardin's

car, he saw the passenger in the Chevrolet also smiling. He identified the defendant in court as the passenger. He also made an in-court identification of Jackie Wilson as the driver. After the brown Chevrolet left, Hardin saw two police officers, one lying in the street and the other lying at the curb. After determining the condition of the officers, Hardin used the squad car radio to call for help.

Hardin subsequently returned to his home in San Antonio, Texas. Officer Hill came to his home on February 23 and showed him a photograph of the lineup Sims had viewed on February 14. Hardin identified the defendant and Jackie Wilson from the lineup photos. Hardin had been convicted of attempted armed robbery in 1976 when he was "about 17."

Hardin denied that he was smoking marijuana and denied that he said the driver looked like a man called "Baby Hooks." He filed a lawsuit to recover the reward money, but he said he was "not pursuing with the case probably anymore."

Willa Washington was the owner of Willie's Beauty Shop located at 1440 West 115th Street in Chicago. During early February 1982, the defendant was staying at the beauty shop. The defendant was the only one who had keys to the shop other than Willa Washington and her assistant Joyce. Two days after the murders of Fahey and O'Brien, Washington saw the defendant at the beauty shop. He was carrying two bags at the time, and Washington asked him to take them back to the storage room.

After Donald White was arrested, he gave the police information which led them to look for the defendant at Willie's Beauty Shop. Detective Joseph Gorman and several other officers went to Willie's Beauty Shop on February 13, 1982, to arrest the defendant. The defendant was not there. Gorman went to the back room where he had heard the defendant had been sleeping. On top of a partition, wide enough for a person to hide on, Gorman found the service revolvers of O'Brien and Fahey and a sawed-off shotgun.

In the early morning of February 14, 1982, Police Captain Joseph McCarthy led a team of officers to an apartment on the west side of Chicago where he arrested the defendant. When asked if he had a gun, the defendant said that a gun was in a duffel bag on the floor. A loaded, chrome, snub-nosed Colt .38 revolver was found in the duffel bag. The defendant's fingerprints were found on the revolver. The bullets in the revolver were "consistent with" police ammunition. Also recovered from the duffel bag were a white smock, plastic gloves, a man's surgical shirt and some "other bullets."

Dr. Robert Stein performed the autopsies on Fahey and O'Brien. Fahey had died of a gunshot wound to the back of the head fired at very close range. Four bullets had hit O'Brien. One bullet entered the left anterior chest wall, destroyed the left ventricle of the heart and lodged in the skin of the back. In response to a hypothetical question, Dr. Stein testified that the wounds to the officers were consistent with the testimony of Sims.

Firearms examiner Donald Smith testified that he performed tests to determine the origin of five bullets recovered: one from O'Brien's jacket, one from O'Brien's body at the hospital, two from O'Brien's body at the autopsy and one from Fahey's body. All the bullets recovered from the officers' bodies were fired from Fahey's service revolver. The bullet which fell from O'Brien's jacket could have been fired from Fahey's revolver, but the bullet was too mutilated for Smith to make a definite comparison.

The police also recovered a brown 1978 Chevrolet with a missing grille which belonged to the defendant's sister, Bobbie Rucker. Sims and Hardin identified pictures of the car as the car involved in the killing of the officers. The defendant's fingerprints were lifted from a number of places in his sister's car, including the driver's door window and the rear seat ashtray.

Derrick Martin testified that he knew the defendant by the name of "Gino"; and he knew Edgar Hope by the name of "Ace." On the afternoon of February 9, 1982, Martin was in the living room of the home of Donald "Kojac" White on the far south side of Chicago. The defendant told the people that were present that "he was looking for police uniforms and guns to break Edgar Hope out of jail." The defendant referred to Edgar Hope as "Ace." Martin knew that Hope was in custody for murder.[1] He saw Danny Kennedy give the defendant several bullets. The defendant pulled out a .38-caliber, snub-nosed, "shiny" revolver with a brown handle. Martin testified that the re-

---

[1] We take judicial notice that Edgar Hope was later convicted of murdering a police officer, who was attempting to arrest him. The murder occurred on February 4, 1982, five days before the murders in this case. His conviction was affirmed, but his death sentence was vacated and the case remanded for a new penalty hearing. (People v. Hope (1990), 137 Ill. 2d 430, 560 N.E.2d 849.) The United States Supreme Court remanded the case for further consideration (501 U.S. 1202, 115 L. Ed. 2d 966, 111 S. Ct. 2792). The Illinois Supreme Court reversed the conviction and remanded the case for a new trial. (People v. Hope (1992), 147 Ill. 2d 315, 589 N.E.2d 503.) The jury in the case before us was not informed that Hope was charged with the murder of a policeman or of the date of the murder.

volver recovered from the defendant's duffel bag looked "exactly like the gun" Martin saw on February 9.

Martin left with the defendant and Jackie Wilson and got into the defendant's sister's car. Jackie Wilson drove the car to the corner of 79th and Carpenter, where he dropped Martin off. When Martin got out from the front passenger's seat, the defendant moved to the front passenger's seat, and the car travelled east on 79th Street.

Fifteen minutes later Martin heard sirens; shortly after that, he saw a television news bulletin that two police officers had been killed. Two days later, the defendant called him at four or five o'clock in the morning and asked if Martin had "heard the news." Martin answered, "I figured you had done that," but when the defendant started to talk about it, Martin told him he did not want to hear it. The defendant asked for money and a place to stay; he told Martin that he was trying to get out of town.

Martin had a second telephone conversation with the defendant that evening in which the defendant asked for beer and a "reefer," which is marijuana. During one of the calls, Martin asked Wilson if he still planned to break Edgar Hope out of jail, and the defendant answered, "No, I'm hot myself." The defendant then gave Martin the telephone number 881-9053, the number of Willie's Beauty Shop.

On the afternoon of February 12, Martin called the defendant at the number the defendant had given him; Martin said he had gotten the "reefer." After several more phone calls, Martin met the defendant at a Chicken Shack restaurant near the 95th Street Elevated station. The defendant and Martin then rode the train to the west side. On the train the defendant gave Martin a "confession about the murder." The defendant said that after he and his brother had dropped Martin off, the police had pulled them over, claiming they had tossed a bottle from the car. When Jackie Wilson could not produce a driver's license, the police searched the car. When they found a gun under the defendant's jacket, the defendant grabbed one officer's gun and shot him in the head. Then he shot the other officer. Jackie told the defendant the other officer was "still moving," so the defendant jumped on the hood and shot the officer twice more. He then told Jackie to get the other officer's gun, and they drove to Morgan Park on the south side of Chicago. The defendant told Martin he left the guns at Willie's Beauty Shop and that he was staying on the west side because it was "too hot where he was at."

Martin did not go to the police with the information; the police "came and got" him. He denied he had been arrested in the case; however, he said if he had previously testified he had been arrested,

he was mistaken. (He had testified at the first trial that he had been arrested.) At the police station he denied knowing anything about the crime. When the police told him there was a $50,000 reward, he made a statement "about Andrew Wilson." At the time of trial, Martin had a pending lawsuit against the City of Chicago to recover the reward and was aware he could not win his suit unless Andrew Wilson was convicted. For several months after he first spoke to the police, he had been relocated in "protective custody" and had been paid $17,403 in expenses by the State's Attorney's office.

Martin testified that he had called Appellate Court Judge R. Eugene Pincham two or three times several months before testifying. Martin said he told Judge Pincham he wanted a lawyer but denied telling Judge Pincham he had lied in his testimony at the first trial and that he had been brought without counsel before a judge in 1983 and threatened "unless [he] testified." He denied telling a lawyer named Patrick Gleason that he might have lied in his testimony. (Patrick Gleason later testified for the defendant. He did not testify that Martin told him he might have lied in his testimony.)

The State introduced an invoice from Mueller Optical Company, signed by a "Joseph Wilson." Maureen Owens, a document examiner, testified that the signature on the invoice was in the defendant's handwriting. Robert Mueller, an optician, identified the invoice as one from his company. He made the eyeglasses found at the scene of the killing; he identified them as the eyeglasses he made for the "Joseph Wilson" who signed the invoice. The defendant had used the name "Joseph Wilson" on previous occasions.

Two assistant public defenders testified on behalf of the defendant that they had visited Dewayne Hardin but Hardin had denied being the witness they were looking for. Later, one of the assistant public defenders talked by phone to a man who identified himself as Dewayne Hardin and who was upset at not having received the reward for finding the killer of the two police officers. The man on the phone said that the police and the State's Attorney's office did not exactly tell him to lie, but that he did not tell the whole truth either. (Hardin had previously denied these conversations.)

Eula Childs lived at 8114 South Morgan, down the block from Tyrone Sims. At 2 p.m. on February 9, she was in her kitchen when she heard three gunshots. She went to her front window, where she saw a tall young man look around and get into the passenger side of a brown car. She viewed the same lineup Sims had viewed; she testified that the man she saw at the scene was not the defendant. She did say

that a photograph of the defendant's sister's car looked like the car she saw at the time of the shootings.

Robert Cooney, Jr., was an assistant public defender who represented Edgar Hope on the murder charge. He testified that in March 1982, he received a telephone call from a man who represented himself to be Derrick Martin. The man told him he was under a lot of pressure from the police and that they were keeping him up all night about the Andrew Wilson case. Cooney also testified that Hope was known as "Ace" and had been transferred from the Cook County Hospital to the Cook County jail.

John Dineen, the president of the Fraternal Order of Police, testified that a total of $60,000 in rewards had been offered for the arrest and conviction of the killers of Officers Fahey and O'Brien. Dewayne Hardin and Derrick Martin had sued for the rewards, but the only amount distributed had been $400 to Hardin.

Denita Bentley, a records keeper for the State's Attorney's office, testified that the prosecution had paid relocation expenses for a number of witnesses. Tyrone Sims had received $4,530; Derrick Martin had received $17,403; Dewayne Hardin had received $8,332; and Donald White had received $5,693. Most of the money had been paid to motels and moving companies; very little had been paid directly to the witnesses.

Andre Coulter had been driving the car in which Dewayne Hardin and another passenger named Booker were riding at the time of the killings. Coulter testified that he and the two other passengers had been smoking a potent type of marijuana just before he saw the brown Chevrolet; he saw two men in the Chevrolet, not three, but he was unable to see their faces. Coulter also testified that at the police station Dewayne Hardin said that the driver of the brown Chevrolet, not the passenger, looked like a man called Baby Hooks. Hardin, according to Coulter, had been interested to learn that a reward had been offered in the case. At the time he testified, Coulter was serving a 20-year sentence for murder. He was on bond for the murder charge at the time of the killings of the officers.

R. Eugene Pincham, an appellate court judge at the time of the trial, testified that several months before the case went to trial he had three or four telephone conversations with Derrick Martin. In these conversations, Martin said that he was desperate, that he had no one to turn to and that the State would not give him his money. Martin told him that he had lied in the case and that a prosecutor had brought him before a judge with no defense attorney present and that the judge had ordered him to testify. Martin did not tell him what he

had lied about. Pincham referred Martin to Assistant Public Defender Patrick Gleason.

Patrick Gleason, who had been an assistant public defender assigned to Judge Pincham's courtroom in the criminal court, had two telephone conversations with Derrick Martin. In the first conversation, Martin agreed to meet with Gleason, but Martin did not keep the appointment. In the second conversation, Martin said that he did not want to come to court or to have anything to do with this case.

Dr. Martin Orne, a psychiatrist and a specialist in the study of hypnosis, testified for the defendant. The defendant also called several police officers whose testimony established that the notes taken by many of the officers had been destroyed. We will discuss the testimony of Dr. Orne and the police officers in more detail later.

In rebuttal, Officer John Holmes, a police artist, testified that in the evening on the day of the murders Holmes met with Tyrone Sims to do sketches of the two men involved. Sims said that he could recognize the shooter again if he saw him. Holmes and Sims prepared a sketch of the shooter. Written underneath the sketch was the following description given by Sims: "Suspect #1—Male black, medium to light complexion, approximately 5'10", short natural haircut, prominent eyebrows, neat mustache, large ears, brown and white shirt, possibly corduroy pants, light brown." The sketch was published in the Daily Police Bulletin for February 9, 1982.

Dr. Bennett Braun, a psychiatrist, had hypnotized Tyrone Sims on February 10, 1982, in an effort to help Sims remember the license plate number of the car used by the murderers. We will discuss Dr. Braun's testimony in connection with the testimony of Dr. Orne later.

Detective Patrick O'Hara testified that in February 1982, he had recovered a business card from Edgar "Ace" Hope. Written on the card was the name "Gino" and the telephone number of Willie's Beauty Shop. Hope was in custody for murder at Cook County Hospital.

We will first consider the defendant's claim that the judge erred in denying his motion to suppress Sims' identification. When the supreme court reversed the defendant's conviction and death sentence, it concluded that the trial judge correctly ruled that Sims could testify to his prehypnotic recollection. But the court ordered a new hearing because the parties had not agreed on the extent of Sims' recollection:

> "Sims did not view the defendant until after the hypnosis session, and therefore the State, unless it chooses to argue for the admission of hypnotically induced testimony, must demonstrate

to the court that the post-hypnotic identification of the defendant was anchored in the witness' prehypnotic recollection. The defendant's proffered expert testimony on the effects of hypnosis would assist the trial judge in making that determination. Finally, the defendant should be permitted to present at trial expert testimony on hypnosis, which would aid the jurors in understanding the potential effects of hypnosis on Sims' testimony." *Wilson*, 116 Ill. 2d at 49.

A hearing was conducted pursuant to the supreme court's direction. Tyrone Sims testified that he spoke to the police 30 minutes after the shooting and told them what he had seen and heard. He described the car and the two men. He thought the license number was DJ4.

Around 11 p.m., Sims spoke to Officer John Holmes, a police sketch artist. According to Holmes, Sims thought he would be able to identify the shooter if he were to walk into the room but that "there was a bit of reluctance as to being able to positively identify him." Holmes showed Sims some acetates, because Sims stated that some aids would help him. Holmes printed a description at the bottom of the sketch given by Sims.

On the following day, Sims was brought back to the station between 11 a.m. and noon and spent most of the day looking at more pictures. At 6 p.m. Officer O'Hara introduced Sims to Assistant State's Attorney Michael Angarola, who said the police wanted Sims to see a hypnotist. At the time he testified, Sims did not recall anything about the actual hypnosis except from what he had seen on the videotape of the session he had with Dr. Braun. After the hypnosis, Sims returned to the police headquarters at 9:30 p.m. He saw a lineup consisting of six black males and made no identification.

On February 12, the police brought about 20 pictures to Sims' house. He selected two men he thought were the shooter and driver; he said he was about 50% certain that they were the offenders. (They were pictures of Donald White and Dwight Anthony.) On February 13, Sims viewed a lineup which included White and Anthony, but he could not make any identification. On February 14, Sims viewed another lineup and identified the defendant as the shooter and Jackie Wilson as the driver.

Dr. Bennett G. Braun, a psychiatrist, had extensive experience with the forensic use of hypnosis, including a number of cases in which he testified for the Cook County public defender's office. He hypnotized Tyrone Sims on February 10, 1982, in an effort to help

Sims remember the license plate number of the car used in the shooting of the officers.

The entire prehypnotic interview and hypnotic session with Sims was videotaped. (That videotape was introduced and submitted to the jury but has not been made part of the record on appeal.) The jury was also given a transcript of the prehypnotic interview and hypnotic session. (That transcript also was introduced and given to the jury but is not part of the record on appeal.) Dr. Braun testified that Assistant State's Attorney Angarola and Officer O'Hara requested him to hypnotize Sims in order to find out the license number of the car involved in the shooting. It was imperative to Dr. Braun that the session be videotaped although Angarola did not want it to be taped. Braun said that he followed the "Orne" guidelines for forensic hypnosis which suggest that the complete narrative be taped. He conducted a prehypnotic interview of Sims. Sims described the scene and the scuffle. He described the car, and his only prehypnotic memory of the license plate was a "D," "I," and a "4." Sims asked for aid in recognizing the offenders, but Braun told him that he could not help him. During the hypnosis, Sims described the license plate as "JKL 1989" and finally as "JDK 197." (The license number of the recovered brown Chevrolet was "WG 1085.")

Dr. Braun testified that, in his opinion, the prehypnotic, hypnotic and post-hypnotic interviews did not affect Sims' ability to identify anyone nor did it suggest anyone to Sims. Braun's opinion was based on the fact that: (1) he did not know what the defendant looked like; (2) he had no idea whom the police were looking for, so consequently he could not suggest anything to Sims; and (3) the questioning gave no indication of suggestiveness. He based his opinion on the testimony of Sims, Officer Holmes, Officer Hill and his own training. He had not seen any police reports; consequently, he could not use any of them in formulating his opinion.

In his opinion, Sims' testimony was not influenced by any suggestibility. He said:

> "Mr. Sims observed a shooting in which two police officers were killed, he was able to clearly see the two individuals involved. *** [H]ere is an individual who *** was exceedingly conscientious to make sure he identified the right person, did not appear to be suggestible, particularly in terms of identification or in terms of even the license plate.
>
> * * *
>
> Had there been any residual suggestibility such as he might dream about, etc., he would have expected that to occur at the

line-up on the 13th, especially so as that line-up because of the pictures and his saying I think these are them or he said I believe a fifty-fifty that these are them.

So, when he finally did identify the Wilson brothers on the 14th for me it is a very strong indication that he was not influenced at all by prior—prior influence by myself or anyone else for that matter."

Dr. Braun also testified that he did not alter Sims' testimony or memory:

"The only thing I *** did any work with was the issue of the license plate and the car. So, how could that affect what he did or what he thought with regard to identifying individuals or what happened at the scene of a shooting, I have no way of even imagining how that could happen."

Dr. Martin Orne, a psychiatrist and specialist in the study of hypnosis, testified for the defendant that hypnosis does not improve memory but can induce the creation of artificial memories which seem to be real. According to Dr. Orne, hypnosis can cause confabulations, that is, the filling in of memories with false details which seem to the subject and others to be plausible. He also testified that hypnosis increases certitude so that the subject has confidence in his memories whether true or false. Once a subject has been hypnotized it is impossible to go back and recreate the subject's prehypnotic memories. Therefore, Dr. Orne said, it is necessary to accurately record prehypnotic memory before inducing hypnosis.

He said that he had seen some examples of confabulation when he viewed a videotape of the hypnotic session of Sims with Dr. Braun. One example was the fact that Sims had recited a number of false details about the appearance of the brown Chevrolet.

Dr. Orne testified that there was no way to tell if Sims' identification of the defendant was grounded in his prehypnotic memory, because Dr. Orne deemed the prehypnotic interview to be inaccurate. He admitted that he had not reviewed the sketch or the artist's testimony or the testimony of Officer Hill. He acknowledged that the sketch completed before the hypnosis could be accurate and that the sketch artist's testimony concerning what Sims described would be acceptable evidence of Sims' prehypnotic memory. He also pointed out that Sims had sought help to remember what the offenders looked like. Sims became more confident while he spoke to Dr. Braun. This increased confidence was a product of hypnosis.

The trial judge stated that he was disturbed that Dr. Orne did not review the testimony of Officers Hill or Holmes and had not viewed

the sketch. Having heard the testimony and having reviewed the videotaped hypnosis session, the judge found that: (1) the testimony at the first trial as to the occurrence was substantially but not totally anchored in prehypnotic recollection; (2) Sims' testimony regarding the description of the offender was totally anchored in prehypnotic recollection; (3) Sims did confabulate regarding the license plate number because he was "pushed"; and (4) Sims' description of the defendant was far more detailed than most descriptions upon which convictions are regularly based in light of the sketch and the verbal description. The judge also noted that the description given by Sims to Officer Hill fit the defendant. The judge then ruled that Sims could testify that he identified the defendant in the lineup and that he could identify the defendant in court. Both Dr. Orne and Dr. Braun testified before the jury.

■ Although the defendant does not say so expressly, we gather that he argues now that the trial judge's decision was against the manifest weight of the evidence. At this point, it is appropriate that we correct statements made by the defendant's attorneys in this court and in the trial court in closing argument. In those statements, the attorneys said that Sims misidentified two men, including Donald White. That is not an accurate description of Sims' testimony. He said that he thought the men whose pictures he saw looked something like the men that were involved in the shooting. We also wish to address the defendant's statement now that the description by Sims did not fit the defendant. The only difference between Sims' description and the actual appearance of the defendant which the defendant points to is the fact that the defendant was 29 years old and the description said that he was 20 years old. Pictures of the defendant were introduced into evidence, but, again, the defendant has not made those pictures part of the record on appeal. We accept the trial judge's determination that the description given by Sims fits the defendant.

It would serve no purpose to repeat and analyze the testimony heard on the motion to suppress identification. It is enough to say that the trial judge followed to the letter the directions of the supreme court in *Wilson*, that he was confronted with a question of fact and the credibility of witnesses and that his determination of fact, based on his judgment of the credibility of the witnesses, that the post-hypnotic identification of the defendant by Sims was anchored in Sims' prehypnotic recollection is not against the manifest weight of the evidence.

In the defendant's first appeal, the supreme court held that the trial judge did not err when he denied the defendant's motion to sup-

press Sims' identification testimony because the defendant did not have an attorney present at the lineup. The supreme court pointed out that the right to counsel attaches with the initiation of adversary proceedings against the defendant, and that initiation of proceedings may occur by formal charge, preliminary hearing, indictment, information or arraignment. The supreme court concluded:

> "The complaint was presented to the judge *ex parte*, it was done by a police officer rather than an assistant State's Attorney, *and* the complaint was not filed in court until after the defendant appeared in the lineup. We do not believe that the procedure followed here can fairly be construed as the beginning of adversary proceedings between the State and the defendant." (Emphasis added.) *Wilson*, 116 Ill. 2d at 50-51.

In this retrial, the defendant filed another motion to suppress Sims' identification testimony because of the absence of an attorney at the lineup. A copy of the written motion filed by the defendant is not in the record on appeal. The State filed a response to the motion, but that response is not in the record either.

We are asked to pass judgment on the decision of the trial judge. It must be kept in mind that in order for us to make a reasoned judgment, we must know what was before the judge. It must also be kept in mind that the burden is on the defendant to properly preserve the proceedings in the trial court, and any doubts raised by an incomplete record are resolved against the defendant. (*People v. Perry* (1989), 183 Ill. App. 3d 534, 540 N.E.2d 379.) All that we have before us is the colloquy between the judge and the attorneys in which the attorneys argued the law and made some statements of "fact"; those statements of fact are often unclear.

The defendant's argument may be summarized: His first trial was heard before the supreme court decided *People v. Owens* (1984), 102 Ill. 2d 88, 464 N.E.2d 261, in which the supreme court said that "there is respectable authority that whether adversarial proceedings commence with the filing of a complaint depends on the degree of prosecutorial involvement." (*Owens*, 102 Ill. 2d at 101.) At the time this case was first tried the defendant was not aware that the degree of prosecutorial involvement would be a factor in determining whether adversarial proceedings commenced with the filing of a complaint; consequently, the defendant's attorney did not make a record of prosecutorial involvement in the first trial. In the second trial the defendant learned, for the first time, of prosecutorial involvement before the filing of a complaint to a degree that his right to counsel was triggered.

For the purposes of this opinion only, we will accept the validity of the defendant's argument which, boiled down, is that newly discovered evidence required a suppression of the defendant's identification or, alternatively, he was entitled to a new hearing. For the purposes of this opinion only, we will reject the State's argument that the defendant is not entitled to suppression of the identification or a new hearing if the defendant should have known of the allegedly newly discovered evidence.

■ Our threshold task is to determine what "facts" were brought out in the second trial that were not before the supreme court. We will make our determination from the report of proceedings and not from the parties' briefs. See *Teitelbaum v. Reliable Welding Co.* (1982), 106 Ill. App. 3d 651, 435 N.E.2d 852.

The defendant's attorney began his argument before the trial judge with the statement that the supreme court decided that the prosecutor did not have "any involvement in" the case. He also said that there was nothing in the record before the supreme court of how much involvement the prosecutor had before the issuance of the warrant; there was nothing to show that the prosecutor approved the issuance of the warrant; there was nothing to show that Assistant State's Attorney Angarola was involved in the investigation; and that there was nothing in the supreme court record showing that there was a rule of the police department requiring the police to get approval from the State's Attorney before any application for a warrant was made. The defendant's attorney maintained that the record in the case before us did show Angarola's involvement, the police department rule and approval by the State's Attorney of the police application for a warrant. We judge, therefore, that these facts are the "newly discovered" evidence upon which the defendant relied in the trial court.

The judge pointed out that the felony review program of the State's Attorney's office had been in effect since 1970. He expressed doubt that the supreme court, with all the transcripts of criminal trials before it over the years, was not aware of the felony review unit and its role in assisting the police. The defendant's attorney said that it was his "guess" that the supreme court probably did know of the existence of the felony review unit.

The prosecutor pointed out that the deputy superintendent and superintendent of police could overrule the State's Attorney's rejection of the police right to seek a warrant. The judge then asked the prosecutor whether there was anything in his "files, records, or [the prosecutor's] knowledge that would suggest to [him] that any member

of the State's Attorneys' Office, during the investigatory stage, took over control of the investigation." The prosecutor said that there was not. The judge asked the identity of the police officials who were in charge of the investigation, in addition to Lieutenant Burge, who had been identified as being the "commanding officer." The prosecutor identified several persons, including the superintendent and deputy superintendent of police. He said that the day-to-day street decisions were being made by then Lieutenant, "now Commander John Burge." No objection was made to the judge's questions or the prosecutor's answers. The prosecutor made no objections to statements of fact by the defendant's attorney.

The defendant's attorney told the judge the following:

> "They [the Supreme Court] haven't told us how much in-volvement gives us a Sixth Amendment right and how much in-volvement doesn't give us a Sixth Amendment right. And that's just the point. I—I mean, we need to make some kind of clarification *to find out who was doing what* in that case. That's why we are seeking the hearing." (Emphasis added.)

In arriving at his decision denying the defendant's motion, the judge said:

> "There is nothing to suggest in counsel's motion that the State's Attorney's office in any way controlled or directed the investigation, rather that the Chicago police department did, and as in virtually every serious felony case, there was an as-sistant State's Attorney available as a standard operating pro-cedure for the last, approximately, 20 years in this county to assist technical, legal matters.
>
> Quite obviously, *** the question of hypnosis of Tyrone Sims had a very difficult legal aspect to it.
>
> Certainly it is not suggestive of anything more than typical, technical advice of the Chicago police department that Mr. Angarola became involved in. The supreme court had ruled on this issue.
>
> The court does not feel that there is any suggestion of, any-thing that comes even close, direction by the prosecutorial au-thority and, accordingly, the motion is denied."

We agree with the trial judge's analysis of the evidence that was before him and his conclusion. Preliminarily, we disagree with the statement made by the defendant's attorney that the supreme court decided that the prosecutor did not have "any involvement in" the case. The extent of the prosecutor's "involvement" was not before

the supreme court, because the defendant admittedly did not make it an issue.

A State's Attorney's duties involve the duty to investigate as well as to prosecute. (*People v. Pohl* (1964), 47 Ill. App. 2d 232, 197 N.E.2d 759) His duty to investigate is not exclusive and necessarily involves him with other investigative agencies. Justice is not served when the State's Attorney's duty to investigate collides with the duty of the police to investigate. The State's Attorney does not possess the technical facilities nor the manpower that the police have.[2] Consequently, it is the recognized practice that the State's Attorney sensibly defers to the investigative duties of the police. It is also the general practice that the State's Attorney stands ready to provide assistance to the police. It is inconceivable to us that in a case of this magnitude the State's Attorney's assistance would not be sought by the police on a continuing basis. Significantly, it was both Angarola *and* Officer O'Hara who were involved with Dr. Braun and Sims. In fact, Sims testified that Angarola told him the *police* wanted Sims to see a hypnotist.

The fact that the State's Attorney approved the warrant is of no particular significance. (See *People v. Hayes* (1990), 139 Ill. 2d 89, 564 N.E.2d 803.) By such approval, the State's Attorney does not commit himself to subsequent prosecution. To illustrate, the State's Attorney must have approved the warrant for White; and it must have been the State's Attorney's decision that White would not be prosecuted after Sims failed to identify him in a lineup. The record also established that the superintendent of police could override the decision of the State's Attorney and seek a warrant. In fact, the formal application for the warrant in this case by Officer Bajenski was preceded by a telephone call by the superintendent of police to the judge who issued the warrant.

The judge concluded that the facts presented to him did not establish prosecutorial involvement to the point that the defendant was entitled to an attorney at the lineup. We judge that his decision was correct.

We construe the defendant's alternative oral motion for a hearing to be really a motion for a discovery hearing rather than a motion for a specific order. He wanted a hearing so that he could "find out who was doing what" in the case and *maybe* he would be able to show "involvement" by the State's Attorney which would trigger his right to

---

[2]According to the defendant, there were 50 detectives assigned to the case.

counsel. It is not the function of a trial judge to preside over discovery depositions to satisfy the hopes of the defendant that something will turn up.

The defendant next contends that reversible error occurred when the judge denied the defendant's motion *in limine* to bar any reference to any plan to assist Hope to escape from police custody. The State contends that the evidence was admissible to show the motive of the defendant and thus comes within one of the exceptions to the rule that bars evidence of other crimes.

█ We agree with the State that the decision of the appellate court in the case of Jackie Wilson is precedent holding that the evidence of a plot to effect the escape of Hope was admissible to establish the motive for the killings.[3] The evidence of the recovery of the doctor's smock, surgical shirt and surgical gloves was admissible for the further reason that it corroborated Martin's testimony. It is true that Martin testified to a plan to release Hope from jail and to get police uniforms and guns rather than to release Hope from the County Hospital and to get doctors' gowns and guns. A fact finder who learned that Hope was in the County Hospital under police guard could conclude that Martin misunderstood the precise details of the plot but that there was, in fact, a plan to extricate Hope from police custody wherever he might be. A number of questions arise: Why did the shooter delay his escape in order to seize the gun of Officer O'Brien? Why did the defendant keep the officers' guns, which were extremely incriminating evidence? Why did the defendant have in his possession a doctor's smock, surgical shirt and surgical gloves? Finally, if, as the defendant now argues, it makes no sense that anyone would shoot a police officer to avoid arrest for unlawful use of weap-

---

[3]In *People v. Wilson* (1985), 139 Ill. App. 3d 726, 487 N.E.2d 1015, the appellate court held that the escape plot was properly admitted as motive evidence. In the same opinion, the court held that the trial judge's refusal to instruct prospective jurors regarding the effect of the defendant's failure to testify was reversible error, based on *People v. Zehr* (1984), 103 Ill. 2d 472, 469 N.E.2d 1062. Upon the State's petition for leave to appeal, the supreme court reversed the appellate court and held that the trial judge's refusal to probe the jurors' attitudes toward the defendant's right to refrain from testifying (*Zehr* rule) had prospective application. (*People v. Wilson* (1986), 112 Ill. 2d 567, 513 N.E.2d 844.) On remand with directions to consider the other issues raised by the defendant, the appellate court reversed the defendant's convictions on the grounds that the trial judge abused his discretion in denying the defendant's motions for a severance and that evidence of a warrant was improperly admitted. (*People v. Wilson* (1987), 161 Ill. App. 3d 995, 515 N.E.2d 812.) After a retrial, the defendant was again convicted of the same charges and his appeal is presently before this court.

ons, a misdemeanor, why did the shooter murder the officers? The defendant has provided no answers to those questions. The plan may have been, as the defendant argues, a harebrained scheme with no chance of success; but a man who murders two police officers on a public street in a residential area in the middle of the afternoon is not to be credited with a high degree of circumspection. The obvious weaknesses of the plan go only to the weight of the evidence; those weaknesses have no effect on the admissibility of the evidence. For these reasons, we find no error in the admission of evidence of a scheme to free Hope from police custody.

The defendant next maintains that error occurred when Officer Holmes testified that Sims said he would be able to identify the man who had shot the officers. The defendant contends that what Sims told Holmes was inadmissible hearsay. The State advances three grounds for the admissibility of the testimony: (1) it was the "state of mind" exception to the hearsay rule; (2) it refuted the defendant's claim that the positive identification by Sims was the product of hypnosis; (3) it was a statement made in the process of identification by a witness who was available for cross-examination.

■ Whether the "state of mind" exception applies is problematical, and we need not discuss it, because we have determined that the evidence was properly admitted to answer Dr. Orne's testimony. For the same reason, we need not discuss whether the statement was admissible because it was made by a witness who was available for cross-examination.

When Officer Holmes first testified on the motion to suppress the identification he testified, without objection, as follows:

"Sims intimated he thought he would [be able to identify the shooter.] There was a bit of reluctance as to being able to positively identify him; however, he said he is quite sure he could."

During cross-examination by the prosecutor the following occurred:

"Q. O.K. And he told you at that point that—well what words were his exact words, if you recall when you asked him?

A. The exact words fail me in terms of quoting him verbatim, but in words to the effect, 'I think I would recognize him if he walked in that door.'

Q. You indicated on direct examination there was some reluctance or it sounded like he wasn't quite sure, is that correct?

A. Well, I think it was more or less from the point of view of being specific in terms of providing details of the drawing.

Q. And you said something about he wasn't sure if he could positively identify him. Did he use those words?

A. No. He said he thinks that he could identify the person. It wasn't—it wasn't ever a question I can't identify him."

As previously noted, Dr. Orne testified that the sketch artist's testimony concerning what Sims described would be acceptable evidence of Sims' prehypnotic memory. He also said that Sims evidenced a lack of competence originally when speaking to Dr. Braun but his confidence increased because of the hypnosis.

On cross-examination Dr. Orne was asked in front of the jury if he had read the testimony of Officer Holmes. He said that he had looked at the testimony. When he was asked if he had read it, the defendant's attorney objected on the ground that "[t]his is something that's not in evidence." The prosecutor said, "It is going to be." The defendant's attorney said, "Then his testimony, if he's brought in, should be what the State asks the question about." The following occurred:

"STATE'S ATTORNEY: Well, let me ask you specifically then. If, in fact, Officer Holmes testified, well, I interviewed Mr. Sims as to initially, I asked him if he would recognize the offender.

DEFENSE ATTORNEY: Again, I object.

JUDGE: Objection overruled.

STATE'S ATTORNEY: If the—if the offender should walk into the office presently, he intimated that he thought he would. There was a bit of reluctance as to being able to positively identify him, however, he said he's quite sure that he could. And, at that time, I asked him to give me a description hopefully of this individual's physical appearance from the neck up, frontal view, if he recalls, or if the case he could not recall the frontal view, the best description he could give from any angle that he recalled best. Now, if that conversation was had with Tyrone Sims and he responded with a description prior to the hypnosis on February 9, 1982, that would be a pre-hypnotic recollection to Tyrone Sims, is that right?

A. Yes, it would be."

Officer Holmes did not testify in the State's case in chief. When he testified in rebuttal the following occurred:

"Q. When you first sat down and talked to Mr. Sims on the date of February 9, 1982, did you discuss with him even before starting the sketch his ability to identify the shooter if he saw him again?

A. Yes, sir.

Q. And what did he say?

DEFENSE ATTORNEY: Objection.

JUDGE: Objection overruled.

A. He stated that he could give a description of the offender.

STATE'S ATTORNEY: And did you ask him anything further in relation as to whether if he saw him again if he'd recognize him?

DEFENSE ATTORNEY: Objection.

DEFENSE ATTORNEY: Object.

JUDGE: Objection is overruled.

A. Well, my normal procedure before starting to sketch is I would ask the witness if that person would walk into the room right now would you recognize him.

STATE'S ATTORNEY: Did you ask Mr. Sims that?

A. Yes, I did.

Q. What did he say?

A. He stated that he would and could recognize the individual."

We note that when the defendant's attorney objected to the cross-examination of Dr. Orne and when he objected to the testimony of Officer Holmes, he did not say that the testimony constituted hearsay. His objection to Dr. Orne's cross-examination was that there was nothing in the evidence at that time. To the testimony of Officer Holmes he made only a general objection. Consequently, we do not believe that the defendant has preserved the question of admissibility of hearsay for review. (See *Fornoff v. Parke Davis & Co.* (1982), 105 Ill. App. 3d 681, 434 N.E.2d 793.) Waiver aside, however, we judge that the evidence was admissible in view of Dr. Orne's testimony. His testimony was designed to show that Sims was uncertain of his ability to identify the shooter. His own testimony under cross-examination showed that an expression of Sims, that he would be able to identify the shooter, would be probative on the question of whether the description he gave Holmes was a "free hypnotic recollection" of Sims. In our judgment, the State had laid the foundation for the introduction of Holmes' testimony and, indeed, was required to introduce it.

The defendant next contends that he was improperly restricted in his cross-examination of Derrick Martin. At the defendant's first trial, Derrick Martin admitted that he had committed crimes with Edgar Hope; he also admitted that he had robbed Boushelle Carpets in 1981. In this trial, the defendant was prevented from asking Martin about

crimes he had committed with Hope and prevented from asking Martin whether he had robbed Boushelle Carpets. On direct examination, Martin testified he had been convicted of armed robbery and attempted murder in 1976 and paroled in 1981. The defendant was prevented from asking questions which would have shown that one of Martin's convictions was for the attempted murder of a police officer whom Martin had shot at as the officer was trying to arrest him for the armed robbery of an ice cream parlor. The defendant maintains that the rulings restricting his cross-examination of Martin were reversible error.

We begin with a restatement of the general principles that the scope of cross-examination is within the sound discretion of the trial judge and that while bias of a witness may always be shown, the evidence of bias must not be uncertain or remote. (*People v. Triplett* (1985), 108 Ill. 2d 463, 485 N.E.2d 9.) The trial judge has no discretionary power to deny the defendant his right to show bias but does have broad discretion to preclude repetitive or unduly harassing questioning. We conclude that the trial judge did not abuse his discretion in limiting the cross-examination of Martin.

In *People v. Merz* (1984), 122 Ill. App. 3d 972, 461 N.E.2d 1380, the defendant was allowed to cross-examine a juvenile witness regarding two juvenile court proceedings against him which resulted in adjudications and supervision. But the defendant was barred from cross-examining the witness about juvenile arrests and station adjustments which did not result in court actions *and which occurred before the offense for which the defendant was on trial*. The appellate court upheld the trial judge's ruling and emphasized that there were no pending proceedings arising out of the arrests at the time the juvenile testified. The court concluded that the evidence sought to be introduced was "too remote, uncertain, and speculative to be admissible for impeachment purposes. Defendant must at least present direct evidence, rather than uncertain or remote evidence that such bias exists." *Merz*, 122 Ill. App. 3d at 977.

In the case before us, there were no charges pending against Martin at the time he testified in 1983 or when he testified the second time. When he testified the second time, the statute of limitations had run on any offenses that occurred in 1981. There is nothing in the record to show that the State was even aware of Martin's involvement in any robberies in 1981 when he testified in 1983. Moreover, he was specifically asked by the State's Attorney whether any promises had been made to him, and Martin answered that there had been none.

The defendant's right to show bias of a witness comes within the ambit of a constitutional guarantee. (*People v. Rufus* (1982), 104 Ill. App. 3d 467, 432 N.E.2d 1089.) To determine the constitutional sufficiency of cross-examination, a court looks not to what the defendant had been prohibited from doing, but to what he had been allowed to do. If the entire record shows that the jury had been made aware of adequate factors concerning relevant areas of impeachment of a witness, no constitutional question arises merely because the defendant had been prohibited on cross-examination from pursuing other areas of inquiry. *People v. Maldonado* (1989), 193 Ill. App. 3d 1062, 550 N.E.2d 1011.

The State's own proof showed Martin's unsavory nature and that he was anything but a model citizen. It showed that he knew Hope and that he was such a confidant that the defendant would tell Martin of his plan to secure the release of Hope, that the defendant would seek help from Martin after the crime and that the defendant would confess to Martin. The cross-examination established that Martin had admitted under oath that he had been arrested by the police, that he had originally lied to the police when he denied any knowledge of the crime and that he told the police about the defendant's involvement only after learning of the existence of a reward. He was a convicted felon; he sued for the reward; he called up Judge Pincham, and by his own admission told Judge Pincham he wanted a lawyer. He never explained why he called Judge Pincham. He was later contradicted by Judge Pincham's testimony that Martin said he lied in 1983 and that he had been coerced into testifying. The defendant's attorney effectively argued all these facts and attempted to convince the jury that Martin was the killer. In view of the substantial cross-examination of Martin and argument to the jury by the defense attorney, the credibility of Martin was clearly brought to the attention of the jury. (See *Rufus*, 104 Ill. App. 3d at 474.) The judge did not abuse his discretion in barring cross-examination of Martin concerning the robbery of Boushelle Carpets in 1981.

The defendant claims that he should have been permitted to show that Martin committed some crimes with Hope because that evidence would show a previous association between Martin and Hope from which a fact finder could infer that Martin was the one who wanted to wrest Hope from police custody and that Martin was the one who killed the officers. (As noted, the defendant's attorney argued to the jury that the admitted evidence pointed to the guilt of Martin. He also suggested that White could have been the killer.)

It is true that an accused may attempt to prove that someone else committed the crime with which he is charged, but that right is not without limitations. (*People v. Ward* (1984), 101 Ill. 2d 443, 463 N.E.2d 696.) The test of whether offered evidence will be admitted or excluded depends upon whether it tends to make the question of guilt more or less probable, *i.e.*, whether it is relevant. (*Ward*, 101 Ill. 2d at 455.) A court may reject offered evidence on grounds of irrelevancy if it has little probative value due to its remoteness, uncertainty or its possibly unfair prejudicial nature. (*Ward*, 101 Ill. 2d at 455.) Although members of a reviewing court might have ruled differently if they had been the trial court, the admission of evidence is within the sound discretion of the trial court, and its ruling should not be reversed absent a clear showing of abuse of that discretion. *Ward*, 101 Ill. 2d at 455-56.

The judge concluded that the proffered evidence was irrelevant and prejudicial to the State's case. His ruling was not an abuse of discretion. If the defendant's position is correct, it would necessarily follow that the State would be permitted to show that the defendant had committed other crimes with Hope. We cannot imagine any court approving evidence of other crimes committed by the defendant and Hope based on this record.

The defendant also maintains that he should have been permitted to show that Martin had been convicted of the attempted murder of a police officer in 1976, who was attempting to arrest Martin while he was committing a robbery. As a general rule, a felony conviction may be shown to impeach a witness, but the facts underlying the conviction are not admissible. (*Knowles v. Panopoulos* (1977), 66 Ill. 2d 585, 363 N.E.2d 805.) The defendant again maintains, however, that the excluded proof would have buttressed his argument that Martin killed the officers. He bases his claim on the novel argument that the *modus operandi* exception to the rule barring proof of other crimes is applicable here. We confess that we have never heard of any exception to the rule being invoked in any case other than one in which the State introduced evidence of other crimes against the defendant.

The weakness in the defendant's analogy is that in all cases where the State is permitted to show that a defendant committed another crime, the State must first prove that the defendant did commit the crime for which he is on trial. The defendant has not introduced any evidence from which it may be inferred even by a preponderance of the evidence that Martin shot the officers.

In addition, we agree with the State that the defendant has failed to meet the requirements of the exception to the rule. To be admissi-

ble under the *modus operandi* exception, the crimes must share peculiar and distinctive features that are strikingly similar. (*People v. Dickerson* (1983), 119 Ill. App. 3d 568, 456 N.E.2d 920.) The defendant did not make an offer of proof. The only thing we know is that in the previous offense the defendant shot at a police officer during the commission of a robbery. He has not made a strong and positive showing of striking similarities in the murder of two police officers in the course of a routine traffic stop and shooting at a police officer who was attempting to arrest Martin during the commission of a robbery. The judge surely did not abuse his discretion by barring evidence that Martin had been convicted in 1976 of the attempted murder of a police officer.

The defendant next argues that error occurred during the cross-examination of a defense witness. Judge Pincham testified that Martin called him three or four times before trial. Martin told Judge Pincham that he had lied at the defendant's first trial; he complained that the State would not give him his reward money; and that an assistant State's Attorney had taken him before a judge without an attorney and threatened him unless he testified. Martin did not tell Judge Pincham what he lied about.

On cross-examination the prosecutor established that he and Judge Pincham had known each other since 1973. The following occurred:

"Q. Judge, as you sit here today when you heard those statements, when you found out that I was involved in that case before and I was involved in that case now, do you believe that I would present suborned, perjured testimony to the jury?

DEFENSE ATTORNEY: Object.

JUDGE: Objection overruled.

A. I do not believe that you would knowingly submit suborned perjury to a jury, to a judge or to anyone else.

Q. Do you believe that I'd take a witness in a case alone in front of a judge and try to force him testify out of the presence of the defense?

A. I do not.

DEFENSE ATTORNEY: I object, Judge.

JUDGE: Object overruled.

A. I do not."

We agree with the defendant that these questions were improper. But in our judgment the impropriety was minor and did not prejudice the defendant. In fact, the evidence may have redounded to the benefit of the defendant. The jury could have concluded that Martin lied to

Judge Pincham when he said he had been forced by a judge to testify at the insistence of the State's Attorney.

Officer O'Hara testified that he recovered a business card from Edgar Hope in February 1982 which had the name "Gino" written on the back with the phone number of Willie's Beauty Shop. The defendant now maintains that admission of this evidence was reversible error.

It is necessary to identify the arguments of the parties. In his opening brief, the defendant maintained that Officer O'Hara's testimony was improper because it was not proper rebuttal, it was hearsay and it repeated the prejudicial proof that Hope was in custody for murder.

In the State's brief, the State argued that the testimony was not hearsay because it was "offered under the state of mind exception to the hearsay rule, as evidence that Edgar Hope was acquainted with defendant, knew where defendant was staying and knew defendant's current telephone number."

In the reply brief, the defendant maintained that the State was wrong when it said the card was "introduced only to show that Edgar Hope knew defendant." The defendant insisted that the "card was used as classic hearsay: to establish that Andrew Wilson was, in fact, 'in that beauty shop.' "

When Officer O'Hara testified the following occurred:

"Q. Now, have you, yourself, personally had contact with Ace back in February of 1982?

A. Yes, sir, I did.

Q. Specifically—

DEFENSE ATTORNEY: Objection, Judge. May we have a brief conference with the court?

(An unreported sidebar discussion was held.)

DEFENSE ATTORNEY: For the purposes of the record, your Honor, we object.

JUDGE: The objection is overruled.

STATE'S ATTORNEY: In the early part of February of 1982, did you have occasion to see Edgar Hope, Ace, in person?

A. Yes, sir, I did.

Q. Did you have occasion to recover anything from him?

A. Yes, sir, I did.

Q. What would that be?

A. I recovered various pieces of—of paper and items from him.

\* \* \*

Q. What do you recognize that exhibit to be?

A. As a business card that I recovered from Edgar Hope.

Q. And what is written on the back of the business card?

A. The name, Gino, and a phone number 881-9053.

Q. On February 9 of 1982, was this same Edgar Hope, Ace, in custody for the charge of murder?

A. Yes, sir, he was.

Q. And where was he, at that time?

DEFENSE ATTORNEY: Judge, this is irrelevant. It is not rebuttal.

STATE'S ATTORNEY: The same point, Judge.

JUDGE: Objection overruled.

Q. Where was he, at that time, on that date?

A. He was in the Cook County Hospital.

Q. Again, he was in custody, is that correct?

A. Yes, sir."

■ We agree that the evidence constituted inadmissible hearsay, but the defendant again has not properly preserved an objection on the ground of hearsay. (See *Fornoff v. Parke Davis & Co.* (1982), 105 Ill. App. 3d 681, 434 N.E.2d 793.) The defendant has also waived any claim that the evidence that Hope was held on a charge of murder was prejudicial. The only objection that the defendant has preserved for review is the claim that evidence that Hope was in the Cook County Hospital was irrelevant and not proper rebuttal.

Even if the objections the defendant now makes had properly been preserved for review, we would find no prejudicial error. The admission of the hearsay evidence was cumulative and harmless. Willa Washington had already established that the defendant was staying at her beauty parlor; and the officers' stolen guns were found at Willie's Beauty Shop. His connection with Hope was established inferentially by proof that when the defendant was arrested, he had a slip of paper with Hope's nickname on it. During closing argument the defendant's attorney identified the telephone number on the slip of paper as Hope's. Martin had already testified that Hope was in custody on a murder charge. Robert Cooney, Jr., also testified that his client Hope was held on a charge of murder and had been transferred from the county hospital to the county jail.

For these reasons, we find that the defendant's claim of prejudicial error in the admission of the card recovered from Edgar Hope by Officer O'Hara must be rejected.

The defendant next contends that his constitutional right of due process was violated because the police failed to preserve evidence. Sergeant McKenna and Detectives Hill and O'Hara were called by the defendant, and all testified at considerable length about their activities in the investigation in this case. All three testified that they had made notes during the investigation but had destroyed the notes after the contents of the notes were memorialized in their official reports.

Before we begin our discussion of this argument, it is appropriate that we address the following statement in the defendant's brief:

> "Police did not preserve either the photo array from which Tyrone Sims originally identified 'Kojac' as the offender, or the line-up which prompted Sims to retract this identification. (R. 2469, 2561, 2569, 2579.) They also did not preserve the photo array shown to Dewayne Hardin. (R. 2583.)"

We inferred from that statement in the defendant's brief that the police had also destroyed the photo arrays that Tyrone Sims had examined and the photo array shown to Dewayne Hardin. Our examination of those parts of the record cited by the defendant in his brief has disabused us of any such inference.

Our first response to this statement is to refute again the allegation that Sims "originally identified [White] as the offender." Our second response is that the references in the record in the defendant's brief do not show that the police did not preserve the photo arrays of the lineups. Hill was asked if there was a "record" of the photographs or of the individuals that Sims saw, and he said that there was not. O'Hara was asked if *he* still had the 75 to 100 photographs he showed Sims, and he answered that he did not. He also testified that it was *not* "fair to say" that the photographs Tyrone Sims actually picked out "were not preserved in this case." He was asked the follow-up question, "Well, where are they?" and he said, "I have no idea."

O'Hara also testified that when he went to San Antonio to see Dewayne Hardin he took photographs, but not the photographs of the line up that was conducted on February 10. When he was asked where the pictures were that he had shown to Dewayne Hardin, he said, "I don't recall, sir." When he was asked if the pictures were still in existence, he said, "I would have to check. I do not know if they were inventoried or not. I do not recall." Similarly, when he was asked where the individual Polaroid photographs he showed Hardin were, he said, "I don't know where they are now."

The testimony of those officers shows only that they did not know where the evidence was. It does not show that the "police" did not

"preserve" the evidence. We wish to express our strong disapproval of making allegations of fact in a brief that are not supported by the record. Our expression of even stronger disapproval extends to the State, which has referred us to parts of the record that the State now concedes do not exist. To make matters worse, the State tried to shift the blame on the defendant's attorney and made further misrepresentations of the record in doing so.

We will consider only the defendant's claim that his right to due process was violated by the destruction of the police officer's notes which were later "memorialized" in their official reports. In *Arizona v. Youngblood* (1988), 488 U.S. 51, 102 L. Ed. 2d 281, 109 S. Ct. 333, the Supreme Court held that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law. In *People v. Holmes* (1990), 135 Ill. 2d 198, 552 N.E.2d 763, the Illinois Supreme Court discussed *Youngblood* and implicitly adopted the "bad faith" standard for destruction or loss of evidence but refused to accept it in a case where the prosecutor failed to produce an informer. In *People v. Hall* (1992), 235 Ill. App. 3d 418, 601 N.E.2d 883, the appellate court affirmed the conviction despite the fact that the tape of an interview with the complaining witness had been lost by the State's Attorney. The majority opinion and the dissent contain a very large number of cases dealing with the issue of lost or destroyed evidence. Many of those cases which affirmed convictions involved physical evidence which was lost or destroyed and which might have exonerated the defendant. In this case, the missing notes might have been used only for impeachment of Sims and Hardin.

In the case before us, the three officers, we repeat, testified at great length about their participation in the investigative process. Significantly, the defendant's attorney never asked any of the officers why they had destroyed their notes. O'Hara testified that his notes were memorialized in a typed supplemental report and contained 1½ pages "attributable to Tyrone Sims alone." Hill testified that his notes had been incorporated into a two-page official report, which also included what Sims had told him. Both those reports were made available to the defendant. We judge that the defendant has failed to maintain his burden of showing bad faith on the part of the police officers and thus has failed to show any violation of his right to due process.

The defendant also contends that the "systematic destruction of evidence was compounded by prejudicially improper restriction of defendant's closing argument." During his argument, the defendant's attorney said this:

"And all of the notes, all of the to/from memos, all of the grid search reports; all of those are destroyed.

Oh, we always destroy those when we make out our formal reports.

Yeah, yeah, and you make out your formal reports several days after you got everything all together and *you can sit down with the prosecutor and figure out what would be the most advantageous thing to put in the report, and what would be the most advantageous to pitch, and that's exactly what they did.*

STATE'S ATTORNEY: Objection.

JUDGE: The objection is sustained. Counsel should confine his remarks to the evidence before the jury and should not attempt to testify." (Emphasis added.)

The defendant's attorney now seeks to justify these remarks by characterizing Assistant State's Attorney Angarola's participation as an "attempt to control Dr. Braun's interview with a witness to prevent any record of the witness' early description (or lack of it) of the offender." Dr. Braun testified that Angarola wanted to make sure that Dr. Braun did not ask any questions about identification. Dr. Braun agreed to omit any discussion of what the offender looked like. O'Hara also testified that Angarola and Dr. Braun discussed "what they should go into and what they should not go into." O'Hara explained that he "legally, wasn't real sure about it."

■■ The admonition of Angarola to Dr. Braun was legally sound and proves the wisdom of the police seeking legal assistance from the State's Attorney. Any participation by Dr. Braun in interviews which would involve the identification of the shooter could have caused serious problems for the admissibility of any subsequent identification by Sims. Moreover, it is manifestly unfair to argue that Angarola's interview with Dr. Braun established a conspiracy between Angarola and the police to suppress evidence. Regardless of how the defendant's attorney may seek to put a different interpretation on the remarks in the closing argument, that is precisely what they amounted to—a charge that Angarola and the police conspired to suppress evidence. The argument was improper, and the objection was properly sustained.

The defendant also contends that the judge abused his discretion when he refused the defendant's motion to reopen the proof for further cross-examination of Martin or, alternatively, to grant a continuance for further investigation. After both sides had rested and the instructions had been completed, the defendant filed a motion, but a

copy of the motion is not in the record. Consequently, we must again consider the arguments and statements of "fact" made by the attorneys. The record is so confusing that we would be justified in refusing to consider this claim of error, but we have decided to address it based on what is before us.

When the judge asked what the defendant's attorney wished to say about his "motion," the defendant's attorney referred to it as a motion for dismissal based upon prosecutorial misconduct; the prosecutorial misconduct was alleged harassment of Martin by Detective Hill. The defendant's attorney said he had a tape recording of Martin "saying these things." We judge that the tape recordings were made by members of the news media to whom Martin had spoken.

The prosecutor told the judge the following: Martin left a restaurant where he had been drinking all afternoon, became upset because he was refused further intoxicants and jumped into the Chicago River. He was rescued by the police, taken to a hospital and later released. He spoke to members of the news media and to the police. He spoke to the news media about the "Mafia and the outfit harassing him and his family," and that one of his family members was being held hostage because Martin had "committed robberies of Church's Chickens and Burger Kings that are owned by the Mafia." Significantly, the prosecutor said, "I hope this written motion will be made a part of the record and preserved." (As noted, it was not.)

The judge denied the motion to dismiss and subsequent motions to strike Martin's testimony or to instruct the jury that Martin had acknowledged that he had in fact told Judge Pincham the things that Judge Pincham testified Martin had told him. The prosecutor pointed out that the judge could not instruct the jury on evidence that was not before it. The defendant's attorney then asked that Martin be brought back for further examination "showing him the video tapes and listening to the tapes, the audio tapes and asking him to respond to those."

The prosecutor told the judge that he learned from Martin's mother that Martin was in Madden Zone Center, a mental hospital. He pointed out that he had previously told the judge before trial began that he could not locate Martin and that Martin's lawyer had brought him into the State's Attorney's office for trial preparation. He made that statement to show that he had no control over Martin. The following occurred:

> "JUDGE: Alright. You want an opportunity to go and talk to Mr. Martin?

DEFENSE ATTORNEY: I think he needs to be brought before the court, Judge. I think he needs to be subpoenaed in. I wasn't aware of where he was.

JUDGE: We have final argument scheduled for ten minutes ago. Are you asking for a continuance?

DEFENSE ATTORNEY: I think we should, unless the court grants the other request. I see no other option for us, Judge.

JUDGE: I am not granting the other request. I find there's no basis for any of it.

\* \* \*

JUDGE: Are you asking for a continuance?

DEFENSE ATTORNEY: Yes, Judge.

JUDGE: While you investigate this matter further?

DEFENSE ATTORNEY: To bring in Derrick Martin, yes. We have video tapes we can show—confront him with. We have the audio tape we can confront him with. We have statements that we know he made that we can confront him with.

\* \* \*

JUDGE: Even in his purported last statement to the—to the police reports which you recounted this morning, he reaffirms that Andrew Wilson told him that he was the shooter, is that correct?

STATE'S ATTORNEY: In one version, he says that. In one version he said that he was hiding in the back seat of the car, and that Andrew was the shooter. That's an oral, is my recollection.

JUDGE: Mr. Coventry [defense attorney], you have a man who is apparently in the—in a mental institution, at this time. We are now in the posture of your asking for a continuance in a case that has been on trial for two weeks as of today because he made some bizarre statements over the weekend and late last week, which taken in the best light of what I have seen so far indicates that he reaffirms the central nugget of the whole testimony. That is that Andrew Wilson admitted being the shooter, and that he may have lied to Judge Pincham. He may have lied on the stand about a collateral matter, what he said to Judge Pincham. I do not believe, at this point, that it would be fruitful to grant your continuance. Accordingly, it is denied."

The granting or denying of a continuance to obtain evidence is within the discretion of the trial judge. (*People v. Allgauer* (1969), 114 Ill. App. 2d 405, 252 N.E.2d 671.) When reviewing the exercise of the trial judge's discretion, an appellate court must determine whether

the defendant acted diligently to obtain the evidence and whether the evidence would be material and might affect its outcome. *People v. Tillman* (1980), 82 Ill. App. 3d 430, 402 N.E.2d 825.

On June 15, 1988, five days before the defendant moved for a continuance, the following occurred:

"JUDGE: On the record now. Mr. Sincox [defense attorney], you've been made aware that there are certain statements that have been made by one, Derrick Martin, allegedly, to the press, this afternoon. Derrick Martin was a witness. The gist of it was to admit he talked to Judge Pincham to say certain things which would also be corroborative of that. Possibly, he has made some other statements. He is alleged to have made some statements concerning commission of certain offenses with one, Edgar Hope, and you're aware of that, and the possibilities that he may have said something else which we are not yet aware of, that the media was covering it, is that correct?

DEFENSE ATTORNEY: I am aware of that, yes."

In response to other questions by the judge, the defense attorney then adhered to his previous position that the defendant did not want the jury sequestered.

A jury instruction conference was held on the following day, a Thursday, and the case was continued until the following Monday, June 20, when the defendant's motion was presented. In his reply brief, the defendant's attorney maintains that his trial attorneys did not know about the recantation and alleged perjury of Martin until after the jury instruction conference. He does not explain the defense attorney's answer to the trial judge on June 15. In any event, the trial judge made his ultimate decision on what was before him. He had every right to believe on June 20 that the defendant's attorney was aware on June 15 that Martin allegedly made statements to the news media which contradicted his trial testimony about his conversations with Judge Pincham. We make these observations despite the fact that the trial judge did not refer to a lack of diligence when he made his decision.

Evidence was heard on the defendant's post-trial motion. Dr. Reifman, the Director of the Psychiatric Institute of the Circuit Court of Cook County, testified by stipulation that he examined Martin on June 22, 1988. He found that Martin was "not mentally competent." Martin suffered from a "psychotic condition, specifically atypical psychosis, which interferes with his perception, retention and ability to communicate." Dr. Reifman examined Martin again on July 11; he testified that in his opinion Martin was then mentally competent to be

a witness. He was in good reality contact, his perceptions were reasonably accurate, his memory was reasonably intact and his ability to communicate was adequate for purposes of being a witness in a trial. He understood the meaning of an oath.

Martin was called as a witness by the defendant on the post-trial motion. He testified that he spoke to a group of reporters and his conversations with them were televised. He again denied that he was in the car with the defendant and his brother at the time of the shooting of the officers. He did not remember drinking the day that he spoke to the news media representatives. He never told the doctors at the hospital that he had perjured himself in the Wilson case. He did not remember speaking to Officer Gvozdenovich. He did not remember what he told the officer.

Officer Gvozdenovich testified that he saw Martin swimming in the Chicago River and threw him a life preserver. He went to the Northwestern Hospital and spoke to Martin. Martin said he was depressed and wanted to confess that he perjured himself in the Wilson brothers' trial. Martin said that Andrew Wilson shot the police officers; Wilson was afraid of going to jail, and "they drove to Willie's Beauty Shop." Martin did not tell the officer that he was in the car at the time of the shooting. (The officer took notes of the conversation he had with Martin but threw them away the night after he made out his report.) At the time the officer spoke to Martin, Martin was in restraints and seemed very nervous. Martin did not tell him what he perjured himself about.

■■ Once again, we caution that our review of the trial judge's exercise of discretion must be limited to what was before the judge at the time he made his decision. He was apparently informed that the defendant had admitted to news media personnel that he had told Judge Pincham that he had perjured himself at the trial and that he had told Judge Pincham he had been coerced into testifying. The judge had been informed that Wilson had apparently been intoxicated and jumped into the Chicago River and had subsequently made many bizarre statements. The judge was also aware at the time of the request for a continuance that Martin was in a mental hospital. Most important, he was aware that Martin adhered to the most damaging part of his testimony, that is, that Andrew Wilson had murdered the police officers. We do not believe that *if* the defendant's attorney decided to recall Martin before the jury, and the jury ultimately heard what the judge heard at the post-trial motion, the jury would have returned a different verdict than the one that it did. We repeat our previous observation that the credibility of Martin had been subjected to

more than sufficient scrutiny. The judge was aware of all the infirmities in Martin's testimony that scrutiny revealed. For these reasons, we conclude that the judge did not abuse his discretion in denying the defendant's motion for a continuance.

The defendant next argues that prosecutorial misconduct occurred during the State's opening statement and closing argument. We have considered all of the many remarks cited by the defendant and conclude that the remarks of which the defendant complains do not constitute reversible error.

We note first that no objection was made to any of the remarks made during the opening statement. Consequently any error is waived. (*People v. Johnson* (1991), 218 Ill. App. 3d 967, 578 N.E.2d 1274.) Although some of the remarks could be considered overly rhetorical, they were based on the evidence and were not prejudicial.

██ The defendant maintains that error occurred during closing argument when the prosecutor described the defendant as an "animal" and a "coward." No objection was made to those remarks. Again, any error is waived. Moreover, we do not believe the remarks were improper and, if so, do not require a new trial. *Cf. People v. Green* (1983), 118 Ill. App. 3d 227, 236, 454 N.E.2d 792, 798 (prosecutor's references to defendant as "depraved baby killer," "vicious animal" and the "lowest form of human being" held not error on ground that they "were supported by the record"); *People v. Welton* (1968), 96 Ill. App. 2d 167, 173, 238 N.E.2d 141, 144 (prosecutor's reference to defendant as an "animal" was proper under prosecutor's right to dwell on evil results of crime).

The defendant's principal claim of error during the closing argument is based on the following:

> "STATE'S ATTORNEY: Take that moment in time and freeze it. Think about it. Think about the hearts and minds of those two men, Officers O'Brien and Andrew Wilson. Officer O'Brien [lying] on his back in the middle of the dirty, slushy street, bleeding and helpless, in full police uniform that bears the flag of the City of Chicago, your flag, looking up at the face of Andrew Wilson. What were his last thoughts? Were they of God? Family?
>
> DEFENSE ATTORNEY: Objection.
>
> PROSECUTOR: Partner?
>
> JUDGE: Objection overruled."

That argument would have been better left unsaid, particularly the reference to Officer O'Brien's family, to which the prosecutor, without objection, also referred in his opening statement. But not

every reference to a murder victim's family is reversible error. *Cf. People v. Bartall* (1983), 98 Ill. 2d 294, 322-23, 456 N.E.2d 59, 73 (reference to deceased's family was harmless error, "although the prosecutor's conduct was improper, inexcusable and unprofessional"); see also *People v. Free* (1983), 94 Ill. 2d 378, 447 N.E.2d 218.

The State has cited *People v. Britz* (1988), 123 Ill. 2d 446, 528 N.E.2d 703, in which the defendant was convicted of murder and sentenced to death. During the sentencing hearing the prosecutor gave a "summary detailing the events of that evening through the eyes of the [murder] victim." (*Britz*, 123 Ill. 2d at 472.) The supreme court held that the remarks did not deny the defendant a fair sentencing hearing. The defendant seeks to distinguish *Britz* because the remarks were made by the prosecutor during the sentencing hearing, rather than at the trial to determine innocence or guilt. The very case cited by the defendant, *Brown v. State* (Okla. Crim. App. 1988), 753 P.2d 908, refutes the defendant's argument. In that case, the defendant was convicted of murder and sentenced to death. The Oklahoma Court of Criminal Appeals vacated the death sentence, in part, on the statements of the prosecutor in which he told the jury that if the victim were called back from the grave she would testify that her killing was "heinous," "cruel," and "atrocious"; he also said that the victim would say she "was going through torture during that few minutes as [she] was [lying] there dying." (*Brown*, 753 P.2d at 913.) We say that the case refutes the defendant's argument because the Court of Criminal Appeals affirmed the conviction despite an argument which the court strongly criticized and used as a basis for vacating the death sentence.

Martin testified that the defendant received bullets from Danny Kennedy. The defendant now maintains that the prosecutor prejudicially misstated the evidence when he said that the defendant used the bullets from Danny Kennedy to reload Officer Fahey's gun.

 When the officers' guns were recovered, it was disclosed that the gun of O'Brien, who had not fired any shots, had been unloaded, but the gun of Officer Fahey, which had been fired five times, had been reloaded with six Smith & Wesson .357 magnum jacketed hollow point cartridges, a type of ammunition which was not authorized for police use in 1982. While .38-caliber cartridges may be loaded into a .357 magnum revolver, .357 magnum cartridges may not be loaded into a .38 special revolver. The .38-caliber special revolver recovered from the defendant was loaded with six Winchester-Western .38 Special Plus P cartridges, the same kind of ammunition that was issued to Chicago police officers in 1982. It could reasonably be

inferred that the defendant had unloaded O'Brien's revolver and had loaded cartridges from O'Brien's revolver into his own revolver. The question becomes: What was the source of the .357 cartridges that were in Fahey's gun? It is a reasonable inference that Fahey's gun was reloaded with the bullets that the defendant had received from Danny Kennedy. In summary, we conclude that no reversible error occurred during the State's opening statement or final argument.

The defendant's last contention is that the evidence is insufficient to establish his guilt of armed robbery. His argument is based on the fact that the evidence did not establish beyond a reasonable doubt that the defendant was armed with a dangerous weapon when he took Fahey's gun and that the evidence did not establish beyond a reasonable doubt that he used force to cause either police officer to relinquish possession of his gun. He maintains that he took the police officers' guns as an afterthought.

In *People v. Williams* (1987), 118 Ill. 2d 407, 515 N.E.2d 1230, the defendant was convicted of rape and armed robbery. The victim testified that the defendant ripped her clothes from her and raped her. The defendant was arrested a short time later and had in his possession the victim's gold chain necklace. The defendant argued that "the victim was unable to say at what point in the ordeal the necklace was taken." (*Williams*, 118 Ill. 2d at 415.) The supreme court rejected the defendant's claim that the State failed to prove that force or threat of force was used to effect the taking of the necklace. The supreme court held that the offenses were "essentially a single series of continuous acts committed by the defendant." (*Williams*, 118 Ill. 2d at 416.) The court concluded:

> "Whether the defendant took the necklace from the victim's person or whether he picked it up off the floor after committing the assault, we believe that in this case there was the necessary concurrence between the defendant's use or threat of force and his taking of the necklace to give rise to the offense of armed robbery under the statute." *Williams*, 118 Ill. 2d at 416.

■■■ In this case, there is no doubt that the initial taking of Fahey's gun was by force and against Fahey's will. The defendant was able to keep Fahey's gun and carry it away by putting an end to any possible resistance by Fahey by use of a weapon. The offenses, that is, the armed robbery and the killing, were a single series of continuous acts. The evidence of the armed robbery of O'Brien is even clearer. The defendant, while armed with Fahey's revolver, overcame all possibility of resistance on the part of O'Brien, and his confederate

stole O'Brien's revolver. We find that the State proved the offenses of armed robbery.

The case cited by the defendant, *People v. Tiller* (1982), 94 Ill. 2d 303, 447 N.E.2d 174, is not factually in point and was distinguished in *Williams*. The defendant was convicted of murder, on an accountability theory, and of armed robbery for his taking the murder victim's vehicle. The defendant had left the scene before the murder was committed by a codefendant and only later returned to take the vehicle, a jeep which was parked nearby. Thus, in *Tiller*, the State failed to show a concurrence between the codefendant's use of force and the defendant's taking of the victim's property.

We have recognized that the cross-examination of Judge Pincham was harmless; we have held that the card recovered from Hope was harmless hearsay; and we have held that the prosecutor's brief reference to the deceased's family was also harmless. We have also held that the defendant has waived assignments of error for failure to object or to make specific objections. The defendant has argued that we should hold that the waiver rule is not applicable here; that instead, we should regard any error as plain error. We disagree.

Plain error should be recognized where the evidence is closely balanced or a fair trial was denied. (*People v. Shields* (1991), 143 Ill. 2d 435, 575 N.E.2d 538.) We understate when we say that the evidence is not closely balanced; the State's case was an extremely strong one. In our judgment, no other verdict was reasonably possible. The defendant *and his brother* were first identified by Sims, a disinterested witness. They were *both* also identified by Hardin, who, it may be argued, was not a completely disinterested witness. Martin's testimony, although concededly containing some shortcomings, was corroborated by the recovery from the defendant of the slip of paper containing Hope's nickname, the doctor's smock, surgical shirt and surgical gloves and, most important, the gun Martin said the defendant had shown him and others. In addition to those witnesses the circumstantial evidence is extremely strong. The defendant may be able to explain the fingerprints in the car because the car was his sister's; and he may argue, as he did to the jury, that his eyeglasses also could have been in the car but fell out when a third party struggled with the officer; but he is very hard-pressed to explain the so-damaging evidence of recovery of the officers' guns from a place where another independent witness, Willa Washington, places him. The defendant's attorney attempted to point the finger at White and Martin when he argued that they were familiar with Willie's Beauty Shop; but Washington testified that only she, her assistant Joyce and the defendant

had a key to her shop. The defendant makes no attempt to explain his possession of his own gun and the doctor's smock, surgical shirt and surgical gloves.

The defendant was vigorously and thoroughly defended. The trial judge was confronted with many complex and unusual issues to resolve. He gave the defendant every opportunity to be heard and, in our judgment, resolved all those issues correctly. In sum, the defendant may not have received a perfect trial, but he did receive a fair one. We repeat that even if the defendant properly preserved all claims of error for review, our conclusion would be the same.

For these reasons the judgment of the circuit court is affirmed.

Judgment affirmed.

McNAMARA, P.J., and RAKOWSKI, J., concur.