Ralph D. ARMSTRONG, Petitioner–
Appellant,

v.

Warren YOUNG, Respondent–Appellee.

No. 91–3877.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 22, 1994.

Decided Aug. 24, 1994.

Rehearing and Suggestion for
Rehearing En Banc Denied Sept. 21, 1994.

John K. Smerlinski (argued), Madison, WI, for petitioner-appellant.

Sally L. Wellman, Asst. Atty. Gen. (argued), Office of the Atty. Gen., Wis. Dept. of Justice, Madison, WI, for respondent-appellee.

Before POSNER, Chief Judge, and COFFEY and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

A jury found Ralph D. Armstrong guilty of first degree murder and first degree sexual assault, and a Wisconsin trial court sentenced Armstrong to life imprisonment plus sixteen years. The Wisconsin Supreme Court affirmed Armstrong's convictions. *State v. Armstrong*, 110 Wis.2d 555, 329 N.W.2d 386, *cert. denied*, 461 U.S. 946, 103 S.Ct. 2125, 77 L.Ed.2d 1304 (1983). Armstrong then petitioned for a writ of habeas corpus in the district court pursuant to 28 U.S.C. § 2254. The district court denied the petition, and we affirm.

## I. BACKGROUND

The Wisconsin Supreme Court described in detail the events that occurred on the evening of June 23 and the early morning of June 24, 1980 (329 N.W.2d at 389–90), and because we assume familiarity with its opinion, we recount the pertinent facts only briefly here. Charise Kamps was sexually assaulted and brutally murdered early on June 24. Prior to the murder, Kamps had been in the company of Armstrong, Armstrong's fiance Jane May, and his brother Steve Armstrong at May's apartment. Kamps left the apartment at approximately 10:45 p.m. on June 23 to return home. Armstrong left May's apartment shortly thereafter. The testimony that directly implicated Armstrong in Kamps' murder came from Riccie Orebia, who lived next to the victim's apartment building.[1] Orebia testified that she was sitting on her porch at approximately 12:45 a.m. on June 24 when she saw a man drive by in an older model white car with a black top. The man parked his car in a lot across the street and walked into Kamps' building. The same man left the building a short while later and crossed the street, but Orebia saw him return about five minutes later. After approximately another five minutes, the same man again left Kamps' building, and this time

Orebia noticed that he was shirtless and that he was muscular. A few minutes later, the man returned, running, and again entered Kamps' building. Approximately twenty minutes passed before the man again emerged. He was still without a shirt and was running faster than before. Orebia noticed that his skin was "shining." Six or seven minutes later, the man drove out of the parking lot "very fast."

Orebia later told the police investigating Kamps' murder what she had seen. She described the man as "pretty well built" with big arms and a flat stomach, and with long dark hair. She indicated that she would recognize the man if she saw him again. The investigating officers asked that Orebia submit to hypnosis to refresh her recollection of what she had seen. Five days after Kamps' murder, she did so. Under hypnosis, Orebia described the man as being of medium height, with big arms, a small stomach, a fat nose, bushy dark eyebrows, and dark, wavy hair that covered the back of his neck.

A few days after the hypnosis session, the police arranged for Orebia to view a lineup from the spot on the porch where she had been sitting on the night of Kamps' murder. Each of the participants, including Armstrong, was handcuffed and was brought across the street by two officers. Because Armstrong refused to cooperate and went limp, the officers were required to carry him across the street, and they subsequently did the same to two other participants. Armstrong was the second man to be brought across the street, and as his head became visible above some bushes at the scene, Orebia gasped and said, "Oh my God, that's him." Armstrong was later arrested and charged with the sexual assault and murder of Kamps. After a trial, a jury convicted him of those charges.

In his federal habeas petition, Armstrong alleges constitutional error at his trial in the admission of Orebia's allegedly unreliable identification testimony. He also contends that his due process and Sixth Amendment rights were violated by the fact that Orebia

---

1. Orebia is a male transvestite who was referred to at Armstrong's trial as a female. We shall do the same here.

had undergone hypnosis prior to identifying him in the lineup. Armstrong finally alleges a due process violation in the State's failure to disclose in discovery a parking ticket that he considers to be exculpatory. The district court rejected each of these arguments and denied Armstrong's petition.

## II. DISCUSSION

### A. Orebia Depositions

To support his constitutional arguments relating to the lineup and hypnosis procedure, Armstrong relies primarily on two depositions Orebia had provided to Armstrong's counsel prior to trial. Those depositions contradict Orebia's other testimony in this case, as she maintained in the depositions that the man she had seen leaving Kamps' building was *not* Armstrong and that the police had used highly suggestive tactics during hypnosis and at the lineup to convince her to say otherwise. Because the events surrounding those depositions are important to whether we should permit Armstrong to rely on them here, we describe those events in some detail.

After Orebia had identified Armstrong at the July 3, 1980 lineup, she testified at a preliminary hearing in the case on September 2, 1980. She again identified Armstrong at that hearing as the man she had seen on the night of Kamps' murder. Five days later, however, on September 7, Orebia wrote a letter to the prosecutor in which she indicated that the case had upset her greatly, that she had been unable to sleep at night, and that she had sought help at a mental health facility. Orebia also questioned in the letter why she had even bothered to speak up and then stated: "I have tried my best to assist in this case, but my own personal safety and well being at this time [are] my number one concern." (March 19, 1981 Tr. at 256–57.)

The September 7 letter did not indicate that Orebia was attempting to terminate her involvement in the case, but a month later, she was arrested, apparently for disorderly conduct, and while in jail on that charge, she was approached by Armstrong.[2] It is unclear what, if anything, Armstrong may have said to Orebia, but after her release, Orebia contacted Armstrong's counsel and indicated that her earlier identification had been in error. Armstrong's counsel preserved Orebia's recantation at a November 5, 1980 deposition, during which Orebia attested that while she had been in jail, she had noticed that Armstrong was taller than the man she had seen (Nov. 5 Orebia Dep. at 4, 7–8), and that the police had threatened her with a perjury charge if she "blew this case." (*Id.* at 10, 24.) Orebia claimed that since she had first identified Armstrong, the police had been going out of their way *not* to pick her up for prostitution or related offenses, and that the police had offered to buy her a telephone and to find her a nicer apartment. (*Id.* at 22–24.) She indicated unequivocally that Armstrong was not the man she had seen entering and exiting Kamps' building on the night of the murder. (*Id.* at 4, 17.) She also stated that the police had attempted to influence her recollection under hypnosis by planting pictures of Armstrong and his automobile in the room. (*Id.* at 12–14.) As to the lineup, Orebia explained that the police had told her prior to the lineup that the man who committed the murder was in custody and that he would be in the lineup. (*Id.* at 5, 8.) She also indicated that most of the men participating in the lineup were police officers who were wearing the same wig, which they seemed to be passing to one another before crossing the street. (*Id.* at 6.)

Orebia was subsequently arrested again, this time for carrying a concealed weapon (an Exacto knife). She again saw Armstrong while detained in jail, and he allegedly told Orebia not to talk to the detectives. The police also repeatedly asked Orebia if she had spoken to any of Armstrong's attorneys, and she denied having done so. It frightened her that the police were picking her up, charging her, and then dropping the charges or letting her out on her own recognizance when she did not ask to be released. Orebia believed the officers were "hassling" her by being too lenient. In a subsequent statement made to Armstrong's counsel on November 10, Orebia indicated that she wanted to leave town for awhile because she was so

---

2. It appears that as a male transvestite, Orebia was housed in the men's section of the jail.

upset but that she would return to testify on Armstrong's behalf at trial.

On November 21, 1980, Armstrong moved to suppress the Orebia identification on the ground that the lineup had been unduly suggestive, that she had been hypnotized prior to the lineup, and that the police had made improper threats and promises to Orebia prior to the lineup. The state trial court conducted a lengthy hearing on Armstrong's motions and heard testimony from a number of witnesses, including Orebia. At that hearing, Orebia reverted to her original testimony implicating Armstrong. She explained that she had lied to Armstrong's counsel and in the depositions because she had wanted to destroy her own credibility so she would not be required to testify at Armstrong's trial. She indicated that she was not intimidated by the police, nor was she afraid that she would be charged with perjury or other offenses if she changed her testimony. On the basis of this and other testimony, the trial court denied Armstrong's motions to suppress and permitted Orebia's identification testimony at trial. Armstrong's counsel used the depositions to impeach Orebia at trial, but the jury apparently believed her explanation for lying and also believed that she had reverted back to the truth at trial.

In considering Armstrong's challenge to the identification testimony on direct appeal, the Wisconsin Supreme Court did not address Orebia's depositions or how her testimony had changed in the course of the pretrial proceedings. The State explains this omission by pointing out that Armstrong never relied on the depositions in his direct appeal to the Wisconsin Supreme Court, although he did generally charge that the identification procedure was unduly suggestive. Armstrong concedes that he never referenced the depositions in his briefs to the supreme court, but he contends that because the depositions were part of the record on appeal and because he had questioned the propriety of the identification itself, he should not be precluded from again relying on the depositions here to establish a constitutional infirmity in the identification procedure. The State responds that any claim premised on Orebia's deposition testimony was not fairly presented to the Wisconsin Supreme Court and that the claim therefore was either not exhausted or was procedurally defaulted.

■ Before considering a habeas corpus petition on its merits, a federal court must determine " 'whether the petitioner exhausted all available state remedies and whether the petitioner raised all [of] his claims during the course of the state proceedings.' " *Verdin v. O'Leary,* 972 F.2d 1467, 1472 (7th Cir.1992) (quoting *Henderson v. Thieret,* 859 F.2d 492, 496 (7th Cir.1988), *cert. denied,* 490 U.S. 1009, 109 S.Ct. 1648, 104 L.Ed.2d 163 (1989)); *see also Jones v. Washington,* 15 F.3d 671, 674 (7th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 2753, 129 L.Ed.2d 870 (1994). Whether the issue is exhaustion or waiver/procedural default, we look to whether the petitioner "fairly presented" his federal constitutional claim to the state courts. *Jones,* 15 F.3d at 675; *Verdin,* 972 F.2d at 1472–73; *United States ex rel. Sullivan v. Fairman,* 731 F.2d 450, 453 n. 4 (7th Cir. 1984). Before the claim will be considered to have been fairly presented, "both the operative facts and the 'controlling legal principles' must be submitted" to the state court. *Verdin,* 972 F.2d at 1474 (quoting *Picard v. Connor,* 404 U.S. 270, 277, 92 S.Ct. 509, 513, 30 L.Ed.2d 438 (1971)).

■ There is no question here that Armstrong both exhausted and otherwise preserved his constitutional challenges to the identification procedure and to the State's use of hypnosis. The question is instead whether Armstrong waived his ability to rely on the Orebia depositions to support those constitutional challenges by failing to rely on the depositions before the Wisconsin Supreme Court. We think he did not. The Orebia deposition statements were at issue in the suppression hearing before the trial court, and that court ultimately denied Armstrong's motions to suppress after considering Orebia's deposition statements and her explanation for those statements at the suppression hearing. Moreover, the deposition statements were used by Armstrong's counsel to impeach Orebia's testimony at trial. (*See, e.g.,* March 19, 1981 Tr. at 237–54.) Although Armstrong did not refer to the

**426**

depositions in his briefs to the Wisconsin Supreme Court, he again asserted that Orebia's identification was unreliable, both because the lineup procedure was unduly suggestive and because Orebia had been hypnotized prior to the lineup. We think it inconceivable that the Wisconsin Supreme Court was unaware of Orebia's deposition statements in considering those issues, as the depositions were part of the record on appeal and were extensively referenced in the suppression hearing and trial transcripts. As we explained in *Whipple v. Duckworth*, 957 F.2d 418, 421 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 218, 121 L.Ed.2d 157 (1992), a criminal defendant is not required to "restate every factual detail to the state Supreme Court in order to rely on that evidence on collateral review." *Cf. Jones*, 15 F.3d at 675 (petitioner's reliance on firearms worksheet in habeas action proper although worksheet never presented to the state courts). Armstrong's failure to reference those depositions in his briefs to the Wisconsin Supreme Court thus will not preclude his reliance on them here.

■ Yet the State alternatively argues that we must disregard the depositions in any event because the Wisconsin courts implicitly found Orebia's deposition statements not credible. We agree with the State's assessment. At the suppression hearing, Orebia admitted that she had made the statements attributed to her in the depositions, but she explained that her deposition testimony had been untruthful because she had been seeking to destroy her credibility so as to avoid further involvement in the case. (*See, e.g.,* Dec. 1, 1980 Tr. at 34–35, 38–39.) In addition to again identifying Armstrong, Orebia also contradicted at the suppression hearing the statements she had made to Armstrong's counsel at the depositions. For instance, she indicated that the police had not told her prior to the lineup that they had the man in custody who had committed the murder; the officers had instead indicated only that they had a suspect in jail. (*Id.* at 14.) Orebia also stated that the police had made no promises or threats in relation to her testimony, nor had they accorded her any special treatment. (*Id.* at 44, 46, 49.)

After hearing Orebia's testimony and the testimony of a number of other witnesses relating to the lineup and the hypnosis session, the trial court denied Armstrong's motions to suppress, finding that neither procedure was impermissibly suggestive. *See Armstrong*, 329 N.W.2d at 391. The trial court's rulings necessarily indicated that the court believed Orebia's suppression hearing testimony that she had lied in the depositions in order to damage her credibility. Had the court believed Orebia's deposition statements, it would have been hard-pressed to deny the motions and to permit Orebia to identify Armstrong at trial.

■ In this habeas corpus proceeding, we must presume that the factual findings of the state court are correct if the findings are made after a hearing on the merits and are fairly supported by the record. 28 U.S.C. § 2254(d); *Gomez v. Ahitow*, 29 F.3d 1128, 1134 (7th Cir.1994); *Holland v. McGinnis*, 963 F.2d 1044, 1048 (7th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1053, 122 L.Ed.2d 360 (1993). That presumption applies not only to the state court's express factual findings, but also to the implicit resolution of a factual dispute that can be fairly inferred from the state court record. *Andersen v. Thieret*, 903 F.2d 526, 529–30 (7th Cir.1990) (citing *LaVallee v. Delle Rose*, 410 U.S. 690, 694–95, 93 S.Ct. 1203, 1205–06, 35 L.Ed.2d 637 (1973); *Townsend v. Sain*, 372 U.S. 293, 314–15, 83 S.Ct. 745, 757–58, 9 L.Ed.2d 770 (1963)). Thus, where one version of the operative events would necessarily have led the state trial court to suppress an out-of-court identification on the ground that the lineup was unduly suggestive, the fact that the court reached a contrary conclusion permits us to infer that that version was rejected. *Andersen*, 903 F.2d at 530; *cf. Marshall v. Lonberger*, 459 U.S. 422, 433, 103 S.Ct. 843, 850, 74 L.Ed.2d 646 (1983); *Holland*, 963 F.2d at 1049. Here, we may infer from the denial of the suppression motions that the trial court found Orebia's deposition statements to be untruthful, as Orebia herself testified at the suppression hearing. That inference is supported by Armstrong's failure to rely on the depositions before the Wisconsin Supreme Court and by the lack of

any mention of those statements in the supreme court's opinion.[3] We presume that the state court's assessment of Orebia's credibility was correct. *See Maggio v. Fulford,* 462 U.S. 111, 113, 103 S.Ct. 2261, 2262, 76 L.Ed.2d 794 (1983) (Section 2254 does not permit federal habeas courts to substitute their own judgment of witness credibility for that of the state courts); *Marshall,* 459 U.S. at 434, 103 S.Ct. at 850 (same); *Richardson v. Duckworth,* 834 F.2d 1366, 1372 (7th Cir. 1987). Thus, like the state courts, we disregard Orebia's statements in the two depositions in considering Armstrong's constitutional challenges.

### B. Identification

We thus proceed to Armstrong's argument that the line-up was impermissibly suggestive. It is clear that a criminal defendant has a due process right not to be identified prior to trial in a manner that is "unnecessarily suggestive and conducive to irreparable mistaken identification." *Stovall v. Denno,* 388 U.S. 293, 301–02, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967). We must consider whether the "identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968) (citing *Stovall,* 388 U.S. at 301–02, 87 S.Ct. at 1972–73); *see also Killebrew v. Endicott,* 992 F.2d 660, 664 (7th Cir.1993); *United States v. Clark,* 989 F.2d 1490, 1495 (7th Cir.1993) ("the primary evil to be avoided is a very substantial likelihood of irreparable misidentification." (internal quotation omitted)).

■ As we explained in *Montgomery v. Greer,* 956 F.2d 677, 680 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 460, 121 L.Ed.2d 368 (1992), "[t]he constitutionality of an identification is a mixed question of law and fact that is not governed by the statutory presumption of section 2254(d)." (citing

*Sumner v. Mata,* 455 U.S. 591, 597, 102 S.Ct. 1303, 1306, 71 L.Ed.2d 480 (1982) (per curiam)). Although the facts which underlie the state court's ultimate conclusion are governed by section 2254(d)'s presumption of correctness, a federal habeas court " 'may give different weight to the facts as found by the state court and may reach a different conclusion in light of the legal standard.' " *Montgomery,* 956 F.2d at 680 (quoting *Sumner,* 455 U.S. at 597, 102 S.Ct. at 1306). The court, however, must follow a state court's findings on such facts as whether the witness had an adequate opportunity to observe the individual who is later identified, whether the witness' description was sufficiently detailed and accurate, and whether the witness was under pressure from law enforcement officials when she made the identification. *See Sumner,* 455 U.S. at 597, 102 S.Ct. at 1306; *Montgomery,* 956 F.2d at 680. We may disregard findings on those matters only if they lack "fair support" in the record. *See Marshall,* 459 U.S. at 432, 103 S.Ct. at 849.

■ The threshold question is whether the lineup was impermissibly suggestive. We note, as did the Wisconsin Supreme Court (*see Armstrong,* 329 N.W.2d at 397), that the procedure utilized here was not a lineup in the conventional sense but a series of showups. A showup "occurs when only one suspect is presented to [the] witness[ ]" (*Clark,* 989 F.2d at 1495 n. 2), but here, Orebia viewed a number of individuals one at a time. The United States Supreme Court has indicated that "[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." *Stovall,* 388 U.S. at 302, 87 S.Ct. at 1972. Yet we have indicated that "showups are proper and not unduly suggestive under certain circumstances." *Clark,* 989 F.2d at 1495 (citing *United States v. Watson,* 587 F.2d 365, 367 (7th Cir.1978), *cert. denied,* 439 U.S. 1132, 99 S.Ct. 1055, 59 L.Ed.2d 95 (1979)).[4] The Wisconsin Su-

---

3. The district court below also noted that the evidence of record did not support Armstrong's allegations that were based on Orebia's deposition statements. (Mem.Op. at 7.)

4. In addition to the individual showups, Armstrong also complains that this lineup took place

at the very place where Orebia had seen a person entering and exiting Kamps' building on the night of the murder and that Orebia knew that as many as two or three of the participants in the lineup were wearing wigs.

preme Court found that the series of show-ups here was not unduly suggestive (329 N.W.2d at 397), and we are inclined to agree, but we do not decide the issue because even assuming that the identification procedure was impermissibly suggestive, we are convinced that the totality of the circumstances indicate that the identification here was reliable. *See, e.g., Clark,* 989 F.2d at 1495; *Rodriguez v. Young,* 906 F.2d 1153, 1162–63 (7th Cir.1990), *cert. denied,* 498 U.S. 1035, 111 S.Ct. 698, 112 L.Ed.2d 688 (1991); *United States v. Myers,* 892 F.2d 642, 646 (7th Cir.1990) ("[e]ven when the procedure is suggestive ... the identification may be reliable, and if so the evidence comes in.").

The factors to be considered in assessing whether the identification was reliable include: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of [the witness'] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977); *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972); *Rodriguez,* 906 F.2d at 1162. Application of these factors here lead us to the conclusion that Orebia's identification was reliable.

On the night of Kamps' murder, Orebia was seated on her porch, which was directly adjacent to Kamps' apartment building. She saw a man drive down the street, park his car, and then enter and exit the adjacent building three times. She described how the second time that the man left the building he was not wearing a shirt, and she noticed that he had a muscular build. She indicated that he was running when he entered the building a third time and that his skin was "shining" when he subsequently left. Orebia testified that her attention was drawn to the man because it was late, he was the only person on the street, and he was behaving unusually. *See Myers,* 892 F.2d at 647 (woman's behavior "was sufficiently furtive to rivet [the witness'] attention"). We therefore believe that

Orebia had a sufficient opportunity to view Armstrong at the time of his crimes and that she was unusually attentive to what she saw. Indeed, even prior to being hypnotized, Orebia was positive that she would be able to identify the man if she saw him again. *See Armstrong,* 329 N.W.2d at 390.

Moreover, both before and after undergoing hypnosis, Orebia provided police with a fairly detailed description of the man, indicating that he had long dark hair and that he was "well built," with big arms and a flat stomach.[5] This description fit Armstrong, although he actually was taller than the man she had described. Orebia also was quite certain at the lineup that Armstrong was the man she had seen. Indeed, as soon as his head became visible above the bushes, she gasped and said, "Oh my God, that's him." Although Orebia subsequently recanted her earlier identification at the November 5 and November 10 depositions, the Wisconsin courts believed her later testimony that the recantation was false and undertaken merely to avoid further involvement in the case. Finally, the lineup occurred nine days after the crimes, when what Orebia had seen was still fresh in her mind. *See, e.g., United States v. Flannigan,* 884 F.2d 945, 950 (7th Cir.1989) (five day period "so short" that it supports reliability of identification), *cert. denied,* 497 U.S. 1027, 110 S.Ct. 3277, 111 L.Ed.2d 786 (1990); *Jones v. Wisconsin,* 562 F.2d 440, 443 (7th Cir.1977) (two-week period between crime and showups not so long as to undercut reliability).

The totality of the circumstances therefore convince us that even if the lineup procedure was unduly suggestive, there was not a substantial likelihood that Armstrong was misidentified. We thus find no due process violation in the admission of Orebia's identification testimony.

## C. Hypnosis

Related to the identification issue, Armstrong also maintains that his due process and Sixth Amendment rights were violated when Orebia's identification testimony was admitted at trial despite the fact that Orebia

---

**5.** After the hypnosis session, Orebia added that the man was of medium height, that his hair covered the back of his neck, and that he had a fat nose and bushy eyebrows.

had been hypnotized prior to identifying him in the lineup. Armstrong suggests, as he did to the Wisconsin Supreme Court, that the Constitution imposes a per se ban on the use of hypnotically-enhanced testimony by the prosecution. The Wisconsin Supreme Court rejected Armstrong's argument, as did the district court below, concluding that a trial judge may admit the testimony of a witness who has undergone hypnosis so long as the defendant is permitted to raise that issue in attacking the witness' credibility and expert testimony is admitted on the effects of hypnosis on memory in order to aid the jury's credibility assessment. *Armstrong*, 329 N.W.2d at 395; *see also Biskup v. McCaughtry*, 20 F.3d 245, 254 (7th Cir.1994) (discussing this aspect of *Armstrong*).

We too have rejected the suggestion that either the Due Process or Confrontation Clauses would forbid all testimony by a witness who has undergone hypnosis in order to enhance memory. *Biskup*, 20 F.3d at 252, 255; *United States v. Kimberlin*, 805 F.2d 210, 219 (7th Cir.1986) (refusing to adopt per se rule of inadmissibility), *cert. denied*, 483 U.S. 1023, 107 S.Ct. 3270, 97 L.Ed.2d 768 (1987); *United States v. Keplinger*, 776 F.2d 678, 704 (7th Cir.1985) (same), *cert. denied*, 476 U.S. 1183, 106 S.Ct. 2919, 91 L.Ed.2d 548 (1986); *see also Drake v. Clark*, 14 F.3d 351, 359 (7th Cir.1994) (rejecting challenge on habeas corpus to the testimony of a witness who had undergone hypnosis). Moreover, the United States Supreme Court has invalidated an Arkansas statute that imposed a per se ban on hypnotically-refreshed testimony because it infringed a *defendant's* right to testify on her own behalf, although the Court did not reach the question here of whether the *prosecution* may use hypnosis in a manner consistent with the Constitution. *Rock v. Arkansas*, 483 U.S. 44, 62, 107 S.Ct. 2704, 2714, 97 L.Ed.2d 37 (1987).

Yet both this court and the United States Supreme Court have recognized that there are dangers when a witness undergoes hypnosis prior to testifying at trial. In *Rock*, for example, the Court observed that "[t]he most common response to hypnosis ... appears to be an increase in both correct and incorrect recollections." 483 U.S. at 59, 107 S.Ct. at 2713. We too have noted that hypnosis may make a witness more susceptible to suggestion, may cause her to attempt to please the hypnotist through her responses to his questions, and may cause "confabulation," which means that the witness may attempt to fill in memory gaps with information she does not actually recall. *Kimberlin*, 805 F.2d at 217–18; *see also id.* at 254 (Cudahy, J., concurring) ("Perhaps, the most pervasive (though not necessarily the most acute) danger of hypnosis is to make witnesses confident of their recall of matters they might otherwise feel themselves to be guessing at or even be sure they could *not* recall." (Judge Cudahy's emphasis)).

Yet these concerns have not led courts to exclude all testimony of previously-hypnotized witnesses; they have instead prompted some courts to adopt procedural guidelines that should or must be followed by investigating authorities choosing to utilize hypnosis. As *Rock* explains:

> One set of suggested guidelines calls for hypnosis to be performed only by a psychologist or psychiatrist with special training in its use and who is independent of the investigation. These procedures reduce the possibility that biases will be communicated to the hypersuggestive subject by the hypnotist. Suggestion will be less likely also if the hypnosis is conducted in a neutral setting with no one present but the hypnotist and the subject. Tape or video recording of all interrogations, before, during, and after hypnosis, can help reveal if leading questions were asked. Such guidelines do not guarantee the accuracy of the testimony, because they cannot control the subject's own motivations or any tendency to confabulate, but they do provide a means of controlling overt suggestions.

483 U.S. at 60–61, 107 S.Ct. at 2713–2714 (citations omitted); *see also Kimberlin*, 805 F.2d at 218–19 (reviewing procedural safeguards adopted by various courts); *State v. Hurd*, 86 N.J. 525, 432 A.2d 86, 96–97 (1981) (establishing guidelines for hypnosis procedure). We have yet to require adherence to a specific set of guidelines, and we decline to do so today, although we reiterate that law

enforcement authorities would be well-advised to follow the *Hurd* or similar guidelines, as that will make the judicial task of evaluating reliability far simpler. *See Kimberlin*, 805 F.2d at 219.[6]

■ In addition to procedures governing the hypnosis session itself, the Supreme Court indicated in *Rock* that the more traditional means of assessing accuracy and reliability would apply even to a previously-hypnotized witness:

> Certain information recalled as a result of hypnosis may be verified as highly accurate by corroborating evidence. Cross-examination, even in the face of a confident [witness], is an effective tool for revealing inconsistencies. Moreover, a jury can be educated to the risks of hypnosis through expert testimony and cautionary instructions.

483 U.S. at 61, 107 S.Ct. at 2714. The Wisconsin Supreme Court focused on these traditional truth-seeking devices in assessing Armstrong's direct appeal and concluded that Armstrong's right to confrontation had not been infringed because Armstrong's counsel had cross-examined Orebia at length and Armstrong had been permitted to introduce expert testimony on the effects of hypnosis on accurate recall. *Armstrong*, 329 N.W.2d at 394. We would add that Armstrong's counsel also cross-examined the hypnotist and that the jury heard and viewed videotapes of the hypnosis session. Armstrong's expert also identified for the jury the parts of the videotape that he considered impermissibly suggestive. In these circumstances, we must agree with the Wisconsin Supreme Court that the jury was provided an adequate basis "for evaluating the truth of Orebia's testimony." *Id.* We therefore concur in the supreme court's conclusion that Armstrong's rights under the confrontation clause were not infringed. *See, e.g., Biskup*, 20 F.3d at 255 (rejecting confrontation clause challenge to testimony of previously-hypnotized witness); *Beachum v. Tansy*, 903 F.2d 1321, 1326–27 (10th Cir.) (hypnosis did not

violate confrontation rights), *cert. denied*, 498 U.S. 904, 111 S.Ct. 269, 112 L.Ed.2d 225 (1990); *Bundy v. Dugger*, 850 F.2d 1402, 1415–16 (11th Cir.1988) (no Confrontation Clause violation where witness subject to cross-examination, expert testimony admitted, and jury viewed recordings and received transcripts of hypnosis session), *cert. denied*, 488 U.S. 1034, 109 S.Ct. 849, 102 L.Ed.2d 980 (1989); *McQueen v. Garrison*, 814 F.2d 951 (4th Cir.) (reversing district court finding that admission of hypnotically-enhanced testimony violated the defendant's right to confront witness), *cert. denied*, 484 U.S. 944, 108 S.Ct. 332, 98 L.Ed.2d 359 (1987); *Beck v. Norris*, 801 F.2d 242, 245 (6th Cir.1986) (no violation of Confrontation Clause where habeas petitioner had ample opportunity to cross-examine both the hypnotist and any witnesses who had been hypnotized); *Harker v. State*, 800 F.2d 437, 441–43 (4th Cir.1986) (no Confrontation Clause violation where witness subject to extensive cross-examination and expert testimony on hypnosis admitted); *Clay v. Vose*, 771 F.2d 1, 4 (1st Cir.1985) (right to confrontation satisfied where previously hypnotized witness was extensively cross-examined, expert testimony was admitted, and the jury viewed tapes of hypnosis session), *cert. denied*, 475 U.S. 1022, 106 S.Ct. 1212, 89 L.Ed.2d 324 (1986).

■ We also do not believe that Armstrong has shown Orebia's post-hypnosis testimony to be so unreliable that it violated his due process right to a fair trial. In this regard, Armstrong emphasizes that the hypnotist may have made improper suggestions regarding the height of the individual Orebia had seen, leading Orebia to indicate that the man was taller than she originally remembered. In addition, Orebia added to her pre-hypnosis description the fact that the man had dark, bushy eyebrows and a fat nose. It is important to note, however, that despite these discrepancies, Orebia's pre- and post-hypnotic descriptions were substantially the same. *See Keplinger*, 776 F.2d at 704–05

---

6. The Wisconsin Supreme Court also refused to require compliance with similar guidelines in its consideration of Armstrong's direct appeal. 329 N.W.2d at 394 n. 23. That court explained that judicial assessment of the reliability of the evidence is facilitated if the prosecutor adheres to certain guidelines, yet the central question of reliability remains regardless of whether guidelines have been followed. *Id.*

(witness had no new memories as a result of hypnosis sessions). Any improper suggestion relative to the man's height was unlikely to have influenced Orebia's subsequent identification, as Armstrong did not walk across the street at the lineup but was carried by two police officers. Moreover, Orebia identified Armstrong as soon as she saw his face appear above the bushes, again suggesting that Armstrong's height was not an influential factor. In addition, as the Wisconsin Supreme Court observed, "because the lineup included only people who were approximately the same height as the defendant, any suggestions regarding height which might have been incorporated into Orebia's memory would not have caused Orebia to pick out [Armstrong] rather than any other person in the lineup." *Armstrong*, 329 N.W.2d at 396. With respect to the facial features (bushy eyebrows and fat nose) that may have been added to Orebia's memory in the course of the hypnosis session, we similarly agree with the Wisconsin Supreme Court that those features would not have caused Orebia to identify Armstrong as opposed to any other participant in the lineup. *Id.*

We concluded above that the lineup procedure here did not give rise to a very substantial likelihood of irreparable misidentification. The fact that Orebia had been hypnotized several days before the lineup does not shake our confidence in that conclusion.

*D. Exculpatory Evidence*

■ Armstrong finally contends that the State violated its duty to disclose exculpatory evidence when it failed to produce, in response to his general request for "Brady material," a copy of the parking ticket Armstrong received the morning following Kamps' murder. *See Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963) (prosecution's suppression of evidence favorable to the accused violates due process, irrespective of good faith); *United States v. White*, 970 F.2d 328, 337 (7th Cir.1992). The parking ticket was written at 10:58 a.m. on June 24, 1980, and it showed that Armstrong's car was parked in a lot near Jane May's apartment at that time. The ticket was used by the State at trial to impeach Armstrong's testimony that upon returning to May's apartment at 1:00 a.m. on June 24, he had parked in a lot located behind the apartment and had then entered the building through the back door, which would explain why no one had seen him return. The ticket tended to suggest that Armstrong had parked in a different lot, impeaching the explanation he had provided in his direct testimony.

Armstrong apparently believes the parking ticket to be exculpatory because it shows that he had returned to May's apartment on the morning Kamps was murdered. May had testified at trial that Armstrong could have returned to her apartment as late as 3:30 a.m. on June 24, although she admitted to having told friends that he had not returned all night. Armstrong himself testified that he returned to May's apartment by 1:00 a.m., and he believes the parking ticket supports his story. We are not inclined to agree, however, as we think the ticket is not particularly probative on this point. The fact that Armstrong's car was in a lot near May's apartment at 10:58 a.m. on June 24 does not establish where Armstrong and his vehicle may have been at 1:00 a.m., 3:30 a.m., or even at 9:00 a.m. on that day. We therefore doubt that the parking ticket could be considered exculpatory under *Brady*, but even if it were, Armstrong still would be entitled to no relief.

■ An error of constitutional dimension does not occur whenever the prosecution fails to disclose potentially exculpatory evidence. The omitted evidence must instead be evaluated in the context of the entire record to determine whether it "creates a reasonable doubt that did not otherwise exist." *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976). We must assess the materiality of the omitted evidence to determine whether its suppression "undermines confidence in the outcome of the trial." *United States v. Bagley*, 473 U.S. 667, 678, 105 S.Ct. 3375, 3381, 87 L.Ed.2d 481 (1985). "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 682, 105 S.Ct. at 3383; *see*

also *United States v. Roberts,* 22 F.3d 744, 753 (7th Cir.1994); *Jones v. Washington,* 15 F.3d 671, 676 (7th Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 2753, 129 L.Ed.2d 870 (1994).

The omitted evidence here does not undermine our confidence in the outcome of Armstrong's trial. First, although the State did not disclose the parking ticket as part of its *Brady* material, the jury still heard testimony about the ticket at trial. Armstrong was thus free to argue to the jury that the ticket supported his story that he had returned to May's apartment at 1:00 a.m. *Cf. Roberts,* 22 F.3d at 753. To the extent Armstrong was impeached at trial by production of the ticket, that too had no effect on the verdict here. Armstrong was impeached at various points in his testimony, and we are confident that the jury's verdict would have been the same had Armstrong not been impeached as to the location of his vehicle on the morning of June 24.

## III. CONCLUSION

For the foregoing reasons, the district court's judgment denying Ralph Armstrong's petition for a writ of habeas corpus is

AFFIRMED.