**UNITED STATES ex rel. Andrew WILSON, Petitioner,**

v.

**Howard PETERS, III, Respondent.**

**No. 97 C 3006.**

United States District Court, N.D. Illinois, Eastern Division.

June 30, 1999.

Andrew Wilson, Pontiac, IL, petitioner, pro se.

Darryl Belmonte Simko, William Lloyd Browers, IL Atty. General's Office, Chicago, IL, for howard Peters, III, respondent.

### MEMORANDUM AND ORDER

MORAN, Senior District Judge.

Petitioner Andrew Wilson, currently incarcerated at the Pontiac Correctional Center in Pontiac, Illinois, was convicted by a jury of the murder of two Chicago police officers and two counts of armed robbery, and sentenced to death. In 1987 the Illinois Supreme Court reversed the conviction and remanded the case for a new trial. On June 20, 1988, petitioner was again convicted of both murders and robberies, and sentenced to imprisonment for his natural life. On February 2, 1994, the judgment against petitioner became final when the Illinois Supreme Court denied his petition for leave to appeal the appellate court's affirmance of his conviction. On April 4, 1997, petitioner filed this petition for habeas corpus relief, alleging that various constitutional violations led to his conviction. For reasons stated below, the petition is denied.

### BACKGROUND

The Illinois appellate court exhaustively stated the facts of this case in its opinion denying defendant's direct appeal and we consequently will give only an abbreviated reiteration here. *See People v. Wilson,* 254 Ill.App.3d 1020, 193 Ill.Dec. 731, 626 N.E.2d 1282 (1993). On February 9, 1982, Chicago Police Officers William Fahey (Fahey) and Richard O'Brien (O'Brien) stopped a Chevrolet with a damaged front grille. The passenger in the Chevrolet got out of the car and shot both officers, killing them. Tyrone Sims saw the entire event from the front window of his home. He called the police and later worked with a police sketch artist to come up with a composite of the shooter. Sims also gave a verbal description which was written at

the bottom of the sketch. The next day, the police took Sims to Dr. Braun, a hypnotist, where he was questioned about the license plate of the car. The following day, February 11, Sims viewed a lineup but made no identification. On February 12, he looked at photographs and picked out the photos of two men, telling the police that the killer and the driver "looked something like the people that was out there that day of the incident." The people picked out were Donald (Kojac) White and Dwight Anthony. Both were arrested and White ultimately gave information that led to the arrest of Andrew Wilson (petitioner) and his brother, Jackie Wilson.

On February 13, 1982, Sims viewed a lineup that included Kojac and Anthony. He did not recognize them as the two men involved in the shooting. The following day, Sims viewed another lineup and identified Andrew Wilson as the shooter and Jackie Wilson as the driver.

Dewayne Hardin (Hardin) was a passenger in the front seat of a car that passed the scene of the shooting. On February 23, 1982, police showed him a photograph of the lineup Sims had viewed on February 14 and Hardin identified petitioner and Jackie Wilson as the men he saw getting into the Chevrolet at the scene of the crime. Although he initially did not want to cooperate, he changed his mind when he learned that a reward had been offered for information leading to the arrest of the killers. Hardin later filed a suit claiming he was entitled to the reward money.

Willa Washington was the owner of Willie's Beauty Shop located at 1440 West 115th Street in Chicago. During the early part of February 1982, petitioner was staying at the beauty shop and was the only person other than Willa and her assistant who had keys to the shop. After Donald White was arrested he gave police information that led them to look for petitioner at Willie's Beauty Shop. On February 13, 1982, while seeking to execute an arrest warrant for petitioner, an officer found the service revolvers of O'Brien and Fahey and a sawed-off shotgun (similar to one of the weapons used in the crime) at the beauty shop. The next day the police located and arrested petitioner, who was in possession of another weapon.

The police also recovered a brown 1978 Chevrolet with a missing grille that belonged to petitioner's sister, Bobbie Rucker. Both Sims and Hardin identified pictures of the car as the one involved in the killing of the officers, and petitioner's fingerprints were lifted from the car. Petitioner's eyeglasses were also found at the scene of the shooting.

At trial an acquaintance of petitioner's, Derrick Martin, testified that he knew petitioner, and that on the afternoon of February 9, 1982, Martin, petitioner, and others were at Kojac's house on the far south side of Chicago. Martin testified that petitioner told him that he was looking for police uniforms and guns to break Edgar Hope out of jail. Edgar Hope was a former criminal partner of both Martin and petitioner. Martin testified that he then left Kojac's house with petitioner and his brother in Bobbie Rucker's Chevrolet. Jackie Wilson drove the car to the corner of 79th and Carpenter, where he dropped Martin off. When Martin got out from the front passenger's seat, petitioner moved to that seat and he and his brother drove away. Fifteen minutes later Martin heard sirens.

Two days later petitioner called Martin and asked him if he had heard about the shooting. Martin answered, "I figured you had done that," but when petitioner started talking about it, Martin told him he did not want to know more. Three days later Martin met defendant, who said he had shot both officers. Shortly thereafter petitioner was arrested and Martin testified against him in both trials that followed. Martin later claimed that he had perjured himself in the first trial. At some point he approached a state court judge saying that he was being pressured by the prosecution during the second trial and wanted an attorney so that he would not have to

perjure himself again. Despite these problems with Martin's testimony, it appears that he has consistently maintained that petitioner admitted that he was the shooter of both police officers in the February 9, 1982 incident.

### ANALYSIS

#### I. The Applicability of the *Houston* Mailbox Rule

■ On April 24, 1996, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) became effective. That statute established a one year statute of limitations on a prisoner's habeas claim, running from the day the judgment against a defendant becomes final. In *Lindh v. Murphy*, 96 F.3d 856, 866 (7th Cir.1996), the Seventh Circuit gave petitioners convicted prior to the AEDPA's effective date a one-year grace period in which to file habeas claims, setting as the deadline April 23, 1997. Although petitioner's claim was registered with the clerk's office as filed on April 24, 1997, and thus missed the *Lindh* deadline, the government has moved to dismiss on the ground that the petition was untimely because it was not accompanied by the required five dollar filing fee or a petition to proceed *in forma pauperis*. Specifically, the government argues that because Rule 3 of Habeas Corpus proceedings provides that "[u]pon receipt of the petition *and* the filing fee, or an order granting leave to the petitioner to proceed in forma pauperis ... the clerk of the district court shall file the petition and enter it on the docket," any petition not accompanied by an IFP petition or the filing fee should not be considered "filed." Between the time the government filed its motion and the present, however, the Seventh Circuit has rejected this argument. *Jones v. Bertrand,* 171 F.3d 499, 502 (7th Cir.1999). We do so as well.

#### II. The Constitutional Claims

■ Petitioner's first two claims relate to the testimony of Derrick Martin. First, petitioner argues that the trial court erroneously restricted the defense's cross-examination of Martin, thereby violating petitioner's Sixth Amendment right to confront his accusers and Fourteenth Amendment right to present a defense. Specifically, petitioner alleges that the trial judge erred by not permitting the defense to impeach Martin by asking him whether he had been given leniency for two crimes[1] that Martin admitted committing but for which he was never prosecuted. Petitioner also sought to ask Martin about whether he had committed crimes with Edgar Hope. According to Martin's testimony, immediately before the murders of Officers O'Brien and Fahey, petitioner had talked about trying to break Hope out of jail by impersonating a police officer. The prosecution argued that this was the motive for the murders. In response, the defense argued that Martin was lying about petitioner's involvement in the shooting, arguing that Martin had killed the police officers because he, not petitioner, was plotting to break Hope out of jail. The defense argued that in order to show Martin's motive, they needed to demonstrate the tight bond between Martin and Hope that arose from their prior mutual criminal activities.

To prevail on this or any other claim a habeas petitioner must show that the state court proceeding resulted in a decision that was contrary to, or involved an unreasonable application of, clearly-established law as set out by the Supreme Court. 28 U.S.C. § 2254(d)(1)-(2). Under this standard, a claim that a state trial judge improperly ruled on the permitted scope of cross-examination is unlikely to succeed because the admission of evidence is a matter of state law. *U.S. ex rel. Bryant v. Washington,* 869 F.Supp. 601, 603 (N.D.Ill.

---

**1.** The robbery of a Burger King in 1982, and the robbery of a business, Boushelle Carpets, in 1981.

1994) *citing Estelle v. McGuire*, 502 U.S. 62, 65–69, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).

Here, the defense was permitted to impeach Martin by showing that he associated with both Hope and petitioner, that originally Martin had been arrested in this case, that he had lied to the police about what he knew, that he was a convicted felon, and that he only talked to the police when he discovered that a reward was being offered.[2] In light of this information, admitting evidence of a prior robbery added but little to the jury's information bearing on his credibility. More importantly, although Martin admitted in the previous trial that he committed the robbery in question, there is no evidence that Martin was arrested for that robbery, that the state had avoided prosecuting him for the crime in exchange for his testimony, or even that the state was aware of that robbery at the time of the first trial. In fact, at the time of the second trial the statute of limitations had run on that offense, and the prosecutor specifically stated that Martin was not testifying pursuant to a cooperation agreement. We come to a similar conclusion with respect to the proffered evidence of Martin's previous criminal involvement with Hope. The record indicates that the trial court seriously considered the matter, that the appellate court did the same, and that such evidence would have contributed little to the defense's theory of the case as it had ample facts in evidence upon which to argue that defense and in fact did so.

■ In his second claim, petitioner argues that after he testified, but before closing arguments, Derrick Martin made statements indicating that he had lied at trial, that he had been present at the shooting, and that he had helped the petitioner and his brother hide the guns they took from the police officers.[3] Petitioner claims that despite defense requests, the trial court refused to reopen the defense's cross-examination of Martin or to grant a continuance so that the defense could investigate Martin's suspected perjury. The government argues that this claim is procedurally defaulted by petitioner's failure to present it as a constitutional challenge in state court. We agree. A review of the appellate brief, the Illinois appellate opinion, the case law relied upon in both documents, and the general nature of the claim leads invariably to the conclusion that this was presented as a state law evidentiary claim. *See Verdin v. O'Leary*, 972 F.2d 1467 (7th Cir.1992).

■ Petitioner's fourth claim is that the trial court should have reopened petitioner's motion to suppress the lineup identification where newly discovered evidence clearly showed that adversarial proceedings had been instituted against petitioner prior to the lineup, and, as a result, he was deprived of his Sixth Amendment right to have counsel present. As evidence of this prosecutorial involvement, petitioner points to the fact that Assistant State's Attorney Michael Angarola took Sims to meet with Dr. Braun for the hypnotic interview on February 10, 1982, that ASA Angarola's name appears at the bottom of the sketch drawn by police artist John Holmes only hours after the shooting, that he personally consulted with police throughout the investigation, that the police admitted they had consulted the state's attorney's office about the investigation, and that the state's attorney's office was involved in obtaining the arrest warrant.

■ The Sixth Amendment right to counsel attaches "at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge,

---

2. Our efforts to locate the trial record have been unsuccessful. Accordingly, these factual observations are taken from the Illinois Appellate Court's decision, 254 Ill.App.3d 1020, 193 Ill.Dec. 731, 626 N.E.2d 1282, and the portions of the parties' briefs that are not in conflict.

3. Petitioner also asserts that Martin disclosed his involvement in prior crimes with Hope after he testified, but before closing. Because we previously determined that the trial court did not err in excluding such testimony we need not address that claim.

preliminary hearing, indictment, information or arraignment." *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). Thus, the right to counsel presumptively does not attach at pre-indictment lineups. *United States v. Larkin,* 978 F.2d 964, 969 (7th Cir.1992) (*cert. denied,* 507 U.S. 935, 113 S.Ct. 1323, 122 L.Ed.2d 709 (1993)) *citing Kirby,* 406 U.S. at 688–89, 92 S.Ct. 1877 *and U.S. ex rel. Hall v. Lane,* 804 F.2d 79, 81–83 (7th Cir.1986) *cert. denied,* 480 U.S. 921, 107 S.Ct. 1382, 94 L.Ed.2d 696 (1987). *Id.* A defendant may rebut this presumption by demonstrating that, despite the absence of formal adversary judicial proceedings, "the government had crossed the constitutionally significant divide from fact-finder to adversary." *Id., citing Hall,* 804 F.2d at 82.

■ The evidence here does not show that the government had assumed an adversary role against petitioner at the time he was featured in the lineup. As the Illinois appellate court pointed out, it is common for the state's attorney's office to be involved from the start in high-profile investigations in order to advise the police on the lawfulness of various actions that might be taken throughout the investigation. *See People v. Wilson,* 193 Ill.Dec. 731, 626 N.E.2d at 1295. Thus, ASA Angarola's presence throughout the early phases of the investigation does not mean that the state had decided to focus on petitioner or had closed the investigatory phase of the case. *See People v. Hayes,* 139 Ill.2d 89, 151 Ill.Dec. 348, 564 N.E.2d 803 (1990) *cert. denied,* 449 U.S. 967, 111 S.Ct. 1601, 113 L.Ed.2d 664 (1991) (noting that the state's attorney's duties involve both investigation and prosecution). In fact, only two days prior to the lineup the state had detained two other men, Donald Kojac White and Dwight Anthony, for the same crime, and the day before petitioner's lineup the police had included those suspects in a lineup for Sims. When Sims did not identify them, he was shown a new lineup the next day, from which he positively identified petitioner as the shooter. There is no indication that prior to that moment the state had ended its investigatory phase and turned the adversary process of the state against petitioner.

Petitioner's fifth claim is that he was deprived of his right to due process where the state's attorney caused the forensic hypnotist, Dr. Braun, to forego making an adequate pre-hypnotic record and improperly suggested memories to Sims while he was under hypnosis, by instructing him attempt to recall things as he would in a dream. Although the petition is somewhat imprecise, we gather that the logic of petitioner's argument is as follows: hypnosis is a highly suggestive procedure and poses the problem of creating false, embellished or unreliably bolstered memories. It is consequently important to make a proper and thorough pre-hypnotic record in order to accurately document what the witness remembered before hypnosis and to determine how that compares with post-hypnotic recollections. Where the pre-hypnotic record is inadequate, a witness should not be permitted to testify because there is no way to determine the reliability of his recollection. Here, Sims' pre-hypnotic description of the people he saw shoot the police officers was not thoroughly recorded prior to his session with Dr. Braun, and there is consequently no way to determine the accuracy of that identification. Accordingly, admitting Sims' testimony on the issue of identity violated petitioner's right to due process.[4]

---

4. The government objects to this claim on the ground that it is procedurally defaulted by petitioner's failure to present it to the state court as a constitutional argument. Although we see the merit of this argument, we think that the facts contained in petitioner's brief to the Illinois appellate court on this claim could be interpreted as implicating the due process clause. *See Verdin v. O'Leary,* 972 F.2d 1467 (7th Cir.1992) (holding that federal court will hear habeas claim that was not submitted to state court in constitutional terms, where the claim was made in terms so particular as to call to mind a specific constitutional right). To wit, the cases on witness hypnosis in this circuit commonly discuss the due process implications of the procedure. For this reason, we will assume, without deciding, that peti-

Petitioner accurately summarizes Illinois law on the admission of testimony by witnesses who were subjected to hypnosis: hypnotically-induced testimony by anyone other than petitioner is per se inadmissible in Illinois courts. *People v. Zayas*, 131 Ill.2d 284, 137 Ill.Dec. 568, 546 N.E.2d 513, 518 (1989). A witness may, however, testify to her pre-hypnotic recall, although the proponent of such evidence bears the burden of establishing that the testimony of the previously hypnotized witness is based solely upon that witness' independent, pre-hypnotic recall. *Id.* at 519. The requirements of the Fourteenth Amendment's due process clause are somewhat less stringent. Although post-hypnotic testimony should be approached somewhat cautiously, there is no *per se* rule against its admission in this circuit. *Armstrong v. Young*, 34 F.3d 421, 429 (7th Cir.1994); *Biskup v. McCaughtry*, 20 F.3d 245, 251 (7th Cir. 1994) *citing Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). Both the Seventh Circuit and the Supreme Court have recognized that the primary dangers of hypnotically-induced testimony are that the subject may attempt to give answers pleasing to the hypnotist, may confabulate by filling in any gaps in his or her memory, may respond with a heightened level of suggestibility and may become more confident in his or her recall of things they might otherwise be uncertain about. *Armstrong*, 34 F.3d at 429. For these reasons, although the Seventh Circuit declined to require adherence to any specific guidelines, it has often suggested that adherence to the following standard practices during hypnosis be followed: 1) The session should be conducted by a licensed psychiatrist or psychologist trained in hypnosis; 2) The professional should be independent of either party; 3) Any information given the hypnotist should be written down so that it can be examined later; 4) A pre-hypnotic recording should be made of what the subject recollects; 5) The session should be recorded; and 6)

Only the hypnotist should be present. *Biskup*, 20 F.3d 245, 253–54. These guidelines are similar to the safeguards used by the majority of courts to have considered this issue. We find that these standards were substantially satisfied in this case and that for several other reasons Sims' testimony posed no threat to due process.

First, the record indicates that an accurate pre-hypnotic record was made about Sims' recollection of the shooter's identity. On the day of the shooting Sims gave a detailed description of the man he saw involved in the shooting to a police sketch artist, who both created a sketch and recorded the verbal description at the bottom of the sketch. Sims also gave a detailed statement of the incident to the police, and Dr. Braun made a pre-hypnotic recording as well. Even more importantly, the sole topic of the hypnotic interview was whether Sims could recall the license plate number on the vehicle involved in the shooting. Although a recording was made of the session, and a transcript presented to the jury, *see Wilson*, 193 Ill.Dec. 731, 626 N.E.2d at 1292, petitioner does not provide us with that document and points to no evidence indicating that the identification of the perpetrators was discussed during the hypnotic session. Moreover, Dr. Braun testified that he, of course, had no idea what the perpetrators looked like, and thus could not have made any suggestions to that effect, that he did not know who police were looking for and that he followed the Orne guidelines for forensic hypnosis, which are similar to those described above. The one statement that petitioner points to as suggestive, where Dr. Braun told petitioner to try to recall things as he would in a dream, is neither suggestive nor related to the identity of the suspects. Dr. Orne, who testified on behalf of the defense, tried to bolster the defense argument that Sims' testimony could not be relied upon because there

tioner's claim has been adequately preserved for habeas purposes.

was an inadequate pre-hypnotic record, but admitted that he had reviewed neither the police sketch (which, contrary to defense objections, matched the description of petitioner). For all of these reasons, Sims' identification of petitioner, and his testimony to that effect, did not violate petitioner's right to due process.

 The petitioner's sixth argument is that the prosecution's misconduct during opening and closing arguments denied petitioner's right to due process. As the ·appellate court pointed out, due to defense counsel's failure to object at trial, many of the statements to which petitioner now objects are not preserved for purposes of appeal. Moreover, we find that the few claims preserved by virtue of their having been brought to the attention of the appellate court, do not mandate that the petition be granted. Specifically, petitioner argued that the trial judge erred by permitting references to the victims' families and their suffering and by asking the jury to imagine the state of mind of the officers at the time of their murder. To prevail, petitioner must show that the statements to which he objects caused the jury to reach a guilty verdict, when they otherwise might not have. *Rodriguez v. Peters,* 63 F.3d 546, 558 (7th Cir.1995). In light of the other evidence presented at trial, we cannot say the prosecutor's comments so seriously tainted the jury that petitioner's right to due process was violated.

Although petitioner presents two additional claims, both are procedurally barred by petitioner's admitted failure to raise them on direct appeal. *See* Petition, ¶ 106; *People v. Wilson,* 254 Ill.App.3d 1020, 193 Ill.Dec. 731, 626 N.E.2d 1282 (1993).

5. Petitioner earlier moved for appointment of counsel. We denied the motion but said we would reconsider it after the state filed its answer. We now deny that reconsideration. The petition was prepared by the public defender who represented petitioner at trial but

*CONCLUSION*

For the reasons stated above, the petition for habeas corpus is denied.[5]

could not, because of a conflict, represent him here. It is thorough and competently done. Between the petition and the state's answer we have been well alerted to the issues requiring decision.